T.C. Memo. 1999-388


UNITED STATES TAX COURT


FARMLAND INDUSTRIES, INC., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 11881-93.                Filed November 29, 1999.


<u>Herbert N. Beller</u>, <u>Juan D. Keller</u>, and <u>Norman H. Lane</u>,
for petitioner.

<u>Alan M. Jacobson</u> and <u>Davis L. Zoss</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

WHALEN, <u>Judge</u>:  Respondent determined the following
deficiencies in petitioner's income tax for the years in
issue:

| Year Ended | Deficiency |
|---|---|
| August 31, 1982 | $402,453 |
| August 31, 1983 | 32,312,944 |
| August 31, 1984 | 38,037,781 |
| August 31, 1986 | 21,569 |

The sole issue for decision is whether the gains and losses that petitioner, a nonexempt cooperative, realized from the disposition of certain property should be classified as patronage income for purposes of subchapter T of the Internal Revenue Code (sections 1381-1388). Unless stated otherwise, all section references are to the Internal Revenue Code as in effect during the years in issue. The gains and losses at issue are from the disposition of the stock of three corporations, Terra Resources, Inc., Seaway Pipeline, Inc., and Mex-Am Crude Corp., and from the disposition of certain property used in a trade or business, as defined by section 1231(b).

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The amended stipulation of facts filed by the parties and the exhibits attached thereto are incorporated herein by this reference.

Petitioner is an agricultural cooperative organized under the laws of the State of Kansas. References to

petitioner are to Farmland Industries, Inc. (Farmland), to all predecessor corporations merged into Farmland, and to all subsidiaries affiliated with Farmland, unless the context suggests otherwise.

During the years in issue, petitioner reported income and expenses on the basis of a fiscal year ending August 31. Petitioner's returns for fiscal years 1982 and 1983 were filed on Forms 1120, U.S. Corporation Income Tax Return. Petitioner's returns for fiscal years 1984 and 1986 were filed on Forms 990-C, Farmers' Cooperative Association Income Tax Return. Each of the returns was filed with respondent's service center in Kansas City, Missouri. At the time its petition was filed in this case, petitioner's principal place of business was Kansas City, Missouri.

## History and Organization of Petitioner

Farmland was founded in 1931 as the Cooperative Union Oil Co. It was the successor to a Missouri cooperative corporation called the Union Oil Co., which had been founded in 1929 by Mr. Howard Cowden. Its corporate name was changed to Consumer's Cooperative Association in 1935, and to Farmland in 1966.

Mr. Cowden served as Farmland's president from the time of its incorporation until 1961 and as a member of

its board of directors until 1963.  He was a leader in the farmers' cooperative movement and believed that farmers could improve their overall financial condition by combining their market power.

Petitioner has operated continuously since 1931 as a farmers' cooperative.  From 1931 to 1947, it was taxed as an exempt cooperative.  From 1947 to 1961, it was taxed as a nonexempt cooperative under respondent's administrative interpretations and practices then in effect.  See generally Farmers Coop. Co. v. Birmingham, 86 F. Supp. 201 (N.D. Iowa 1949).  Since 1962, petitioner has been taxed as a nonexempt cooperative under subchapter T of the Internal Revenue Code.

Petitioner is a regional cooperative.  Its members are local cooperative associations whose members are farmers and ranchers.  During the years in issue, petitioner's membership consisted of more than 2,200 local cooperatives which were located primarily in the Midwest.  With the exception of petitioner's president, each member of its board of directors during the years in issue was either a working farmer or a manager of a local cooperative.

Petitioner's articles of incorporation provide that its primary purpose is to engage in agricultural supply and marketing activities for the benefit of its patrons.  Its

bylaws require that net income from cooperative activities be distributed to its patrons on a cooperative basis consistent with the provisions of subchapter T. Historically, petitioner's overall approach has been to conduct business in the most economically advantageous fashion possible to maximize patronage dividends.

The following chart shows petitioner's patronage and nonpatronage income for tax years 1982 through 1986:

| FYE 8/31 | Patronage Income | NOL's and Deductible Dividend | Patronage Income After Deductions | Nonpatronage Income |
|---|---|---|---|---|
| 1982 | ($107,448,343) | -- | ($107,448,343) | [1]$13,013,621 |
| 1983 | 28,048,015 | ($28,048,015) | -- | 1,202,216 |
| 1984 | 104,087,552 | [2](103,945,724) | 141,828 | 14,778,795 |
| 1985 | (17,151,510) | -- | (17,151,510) | [3](1,936,452) |
| 1986 | 23,934,347 | (24,361,501) | (427,154) | [4](29,700,543) |

[1] Petitioner reported nonpatronage taxable income of $12,416,037 on its original return. The parties have stipulated that the correct amount is $13,013,621.

[2] The deduction consisted of a patronage dividend deduction of $20,945,131, a net operating loss of $82,436,819 carried forward from 1982, and a patronage loss of $563,774 in respect of Farmland Agriservices, a noncooperative subsidiary of petitioner, which represented a carryover of net operating loss incurred by the company before its liquidation into petitioner.

[3] Petitioner carried back the nonpatronage loss to its taxable year ending August 31, 1982, and applied it against the nonpatronage income for that year.

[4] Portions of the NOL were carried back and applied against nonpatronage income for taxable years ending August 31, 1983, and 1984.

Petitioner's consolidated operating results for fiscal years 1984 through 1986 are as follows:

| Fiscal Year | Net Savings (Loss) |
|:---:|:---:|
| 1984 | $11,193,000 |
| 1985 | (61,082,000) |
| 1986 | (152,228,000) |

Petitioner was organized for the primary purpose of supplying petroleum products such as gasoline, kerosene, motor oil, lubricating oils, and grease to its member cooperatives for sale to their patrons. Petitioner originally purchased these products in a packaged or processed state from various suppliers and then resold them to its members. During the 1930's and 1940's, petitioner expanded its product lines to include additional refined petroleum products as well as feed, seed, fertilizer, agricultural chemicals, tires, batteries, and miscellaneous farm supplies. Petroleum and fertilizer have been petitioner's two largest product lines, by volume of sales, since at least 1973.

In 1942, petitioner formed a subsidiary called the Cooperative Finance Agency to provide financing to local cooperatives. Petitioner also began a grocery business, a cannery, and a lumber mill to provide goods to its members. Many of petitioner's nonpetroleum lines of business produced little or no profit and required large capital investments. As a result, petitioner's expansion during

the 1930's and 1940's required petitioner to incur substantial debt.

In 1952, petitioner considered constructing a nitrogen plant to produce fertilizer. However, the company did not have sufficient cash to finance the construction. The Wichita Bank for Cooperatives (Wichita Bank), petitioner's primary source of capital, would not lend the required money to petitioner without the approval of the Farm Credit Administration (FCA). The FCA was reluctant to approve a loan because petitioner lacked sufficient equity and permanent capital, had too much outstanding debt, and had a poor assets-to-liabilities ratio. The FCA also felt that the capital investment required to construct the plant was too large given the anticipated return. For that reason, the FCA suggested that petitioner sell assets and eliminate unprofitable product lines to reduce its debt.

Despite its financial difficulties, petitioner began constructing the nitrogen plant without obtaining complete financing for the project. It undertook this project through a new wholly owned subsidiary called Cooperative Farm Chemicals Association. The construction took place at a time when petitioner was experiencing poor financial returns. Nevertheless, in 1953 the Wichita Bank agreed to lend petitioner the funds required to complete the plant on

the condition that petitioner raise cash through sales of common or preferred stock, certificates of indebtedness, or assets. The Wichita Bank also required petitioner to grant the Wichita Bank the right to examine petitioner's books and have a bank representative attend meetings of petitioner's board of directors.

Petitioner's financial difficulties continued into 1954. Petitioner took steps to cut costs and dispose of assets and was ultimately able to complete the nitrogen plant. By 1957, the nitrogen plant was operating profitably, and the financial crisis had dissipated.

In 1957, petitioner formed a subsidiary called Farmbest, Inc., for the purpose of marketing food products of its members. Farmbest's initial business consisted of slaughtering hogs and cattle and processing the meat into finished products. In 1970, petitioner transferred its food marketing business to another subsidiary called Farmland Foods, Inc. In 1976, petitioner acquired a grain marketing cooperative called Far-Mar-Co, Inc.

By the end of 1957, petitioner was one of the six largest industrial corporations in the United States. Petitioner's sales increased rapidly during the period from 1973 to 1980. Petitioner's expansion paralleled and reflected the overall expansion of the agricultural sector

of the economy during the 1970's. Petitioner's management attributed these increases to changes in Federal Government policies which had the effect of encouraging agricultural cultivation, to a general increase in demand for fertilizer and petroleum products, and to petitioner's increased investment in plant and equipment, most notably fertilizer plants and facilities for the exploration for and production of crude oil.

During this period, petitioner raised the capital needed for expansion through debt financing, primarily in the form of loans from the Wichita Bank and sales of subordinated securities. Petitioner also financed its expansion through leveraged leasing and occasionally through loans from commercial banks. During this period, petitioner was highly vulnerable to fluctuations in the prices of agricultural products.

Oil Production and Refining Activities

A significant portion of petitioner's business during the years in issue involved the supply of petroleum products to its members. Since 1973, petroleum products have accounted for the largest volume of petitioner's total sales. Crude oil was an essential raw material for all of the petroleum products sold by petitioner during the years in issue. Over the years, petitioner has sought to improve

the economic efficiency of its petroleum business by controlling as many phases of the production process as possible. This includes acquiring oil refineries, crude oil producing properties, and related transportation systems.

Mr. Cowden began encouraging petitioner's board of directors to establish an oil refinery as early as 1931. He believed that vertical integration in the petroleum business would be beneficial despite the fact that, at least for some time during the 1930's, petitioner was able to obtain favorably priced petroleum products on the open market. Mr. Cowden believed that the cooperative should vertically integrate its petroleum operations to enable it to compete with large companies.

In 1938, petitioner organized a subsidiary called the Cooperative Refinery Association, Inc. (CRA) to construct and operate an oil refinery in Phillipsburg, Kansas. Although CRA was organized as a cooperative, petitioner was at all times its only patron and owned all of its outstanding common stock. The Phillipsburg refinery and a 70-mile network of pipeline were constructed during 1938 and 1939. The refinery officially opened in May 1940, although it did not commence production until 1941. At the time it opened, the refinery was capable of processing

3,000 barrels of crude oil per day. Petitioner purchased all of CRA's production for resale to its patrons.

On March 1, 1939, petitioner's board of directors organized the Cooperative Pipeline Association (CPA) as a wholly owned subsidiary. CPA was organized to construct and operate a pipeline system to deliver crude oil to the Phillipsburg refinery. The construction of the pipeline was to be financed primarily through the sale of preferred stock in CPA to local cooperatives and their individual members. CPA was merged into CRA during petitioner's fiscal year ending August 31, 1947. During its existence, CPA transported oil exclusively to refineries owned by CRA.

Soon after the Phillipsburg refinery opened, petitioner had difficulty obtaining sufficient crude oil to utilize the plant's full production capacity. Under Kansas proration statutes in effect at the time, the wells connected to the refinery had an allowable output of 26,000 barrels per month, or less than 900 barrels per day. In addition, the Standard Oil Co. of Indiana (Standard Oil), one of the primary crude oil producers in the Phillipsburg area, refused to sell crude oil to CRA. The Kansas Corporation Commission also initially refused to increase the allowable output of wells in the Phillipsburg area.

Petitioner was forced to close the Phillipsburg refinery for a short time due to a lack of supply of crude oil.

In an effort to secure an adequate supply of crude oil for the Phillipsburg refinery, Mr. Cowden sought to have the U.S. Department of Justice investigate monopoly conditions in the oil industry. Mr. Cowden also instigated a mail-in campaign designed to encourage the Governor of Kansas to increase the maximum allowable output of wells connected to the refinery. Eventually, Standard Oil agreed to supply crude oil to the refinery. With the exception of a brief shortage in 1948, petitioner was able to purchase an adequate amount of crude oil from unrelated parties to utilize the entire production capacity of the Phillipsburg refinery until the energy crisis of the 1970's. However, petitioner's directors remained concerned about the possibility of shortages.

In September 1940, petitioner formed a wholly owned subsidiary called Consumers Oil Production Association (COPA) to engage in oil exploration and drilling, and to purchase existing oil wells. Petitioner's directors believed that by controlling crude oil production, the company could maintain a consistent level of supply for its refinery and avoid reliance on suppliers who might be hostile toward petitioner. By the end of 1940, COPA held

interests in three producing oil wells located in Rooks County, Kansas, that were connected by pipeline to petitioner's Phillipsburg refinery. COPA sold all of the crude oil it produced to CRA.

Petitioner continued to expand its petroleum-related activities throughout the 1940's. In 1941, petitioner purchased a refinery in Scottsbluff, Nebraska, with a production capacity of 1,500 barrels per day. By the end of its fiscal year 1943, COPA owned interests in 13 producing oil wells. Petitioner's management informed its members that 41 cents of the 84 cents in total savings per barrel created by its petroleum-related business was attributable to crude oil production.

On January 1, 1944, CRA purchased the assets of the National Oil Refining Co. for approximately $3.9 million. These assets included a refinery located in Coffeyville, Kansas, approximately 269 producing oil wells, leasehold interests in more than 8,000 acres of undeveloped land, and a network of pipelines. By the end of 1944, COPA and CRA together owned interests in 293 producing wells. In 1945, COPA was merged into CRA which conducted all of petitioner's oil exploration and production activities from the time of the merger until 1970. By the end of 1945, CRA

was extracting enough oil from its active wells to meet 18 percent of its refineries' needs.

Throughout its existence, CRA obtained crude oil from its own production facilities, from other entities owned by petitioner, and from unrelated third parties. CRA refined this oil into finished petroleum products which it sold to petitioner for resale to its patrons. CRA and its subsidiaries also maintained inventories of crude oil and refined petroleum products. CRA shipped finished products from its refineries directly to petitioner's customers. CRA would generally send invoices to petitioner, and petitioner would send invoices to its customers. Petitioner charged competitive market prices for the petroleum products it sold to its patrons. Petitioner's management believed that its patrons would derive their benefits through the receipt of patronage refunds rather than through discount purchases. Petitioner's management always intended to generate a net profit at the cooperative level without undercutting prevailing market prices.

From 1943 until mid-1992, petitioner was the largest interest holder in a refinery located in McPherson, Kansas, which was operated by the National Cooperative Refinery Association (NCRA). Mr. Cowden was the first president of NCRA, and its other members were, like petitioner, regional

cooperatives.  Petitioner consistently took delivery of its full share of the McPherson refinery's output for resale to its patrons.

During 1972 and 1973, the United States experienced an energy crisis that caused major problems for petitioner and its patrons.  Petitioner was unable to operate its refineries at full capacity due to the scarcity of crude oil and increasing petroleum prices.  Federal price controls on refined products also created a cost-price squeeze on petitioner's operations.  During this time, petitioner was able to produce less than 20 percent of the crude oil required by its refineries.  As a result of the shortages, petitioner ceased selling refined petroleum products to nonmembers.  Petitioner also developed an allocation system designed to ensure adequate distribution of fuel to its members.  Despite these problems, petitioner's petroleum business in 1973 exceeded its performance in the previous year.

Farmers experienced a general shortage of fertilizer during the energy crisis of the early 1970's.  This impaired Government efforts to increase food production and combat price increases.  On October 21, 1973, the Arab oil producing countries implemented an embargo of crude oil, further intensifying the oil crisis.  On January 15, 1974,

the Federal Government began mandatory allocations of crude oil.  However, the shortage began to decrease by the spring of 1974.  In April 1974, following intensive lobbying by petitioner's officers, the Federal Government allocated to petitioner 100 percent of its crude oil needs through June 30 of that year.  Petitioner's annual reports for 1973 and 1974 state that the company was able to adequately provide for the fuel needs of its member-patrons during those years.

Prices of crude oil changed very little from mid-1974 when the Arab oil embargo ended until 1979.  During that period, the spot price for crude oil was at or below the official selling price for Arabian Gulf crude oil.

The price of crude oil increased rapidly in early 1979 due in large part to a political revolution in Iran which cut off a substantial portion of the world's crude oil supply.  British Petroleum, one of petitioner's primary suppliers, had previously obtained a substantial portion of its crude oil from Iranian producers.  The Iranian oil shortage forced British Petroleum to reduce the amount of crude oil it delivered to its customers, including petitioner.

In February 1979, petitioner's Coffeyville refinery was operating below capacity.  On March 1, 1979, petitioner

was forced to limit its allocation of gasoline and other petroleum distillates to its member associations. Allocations for farm use remained at or near 100 percent, but little or no fuel was allocated for nonfarm uses. Petitioner's officers and the managers of petitioner's member associations then began lobbying the Federal Government for relief. Through a combination of efforts, including Government allocations and recertification of the Coffeyville refinery to allow for increased allocations, petitioner was able to adequately supply fuel for its members' agricultural needs. Petitioner's annual report for 1979 states that petitioner had begun searching for alternative sources of supply, and had increased its oil exploration and production activities.

The oil shortage abated during the early 1980's and demand for petroleum products decreased. Petitioner's Scottsbluff and Phillipsburg refineries were closed in 1982 when the capacity of its remaining refineries was deemed adequate to meet its members' needs. However, the Phillipsburg refinery was reopened in 1984. The McPherson and Coffeyville refineries have remained in continuous operation during the time petitioner has held interests in them.

CRA was merged into petitioner in July 1982. Petitioner has owned and operated all of CRA's refineries since that time. Until it merged into petitioner, CRA always filed a separate Federal income tax return. After the merger, petitioner maintained inventories of crude oil and refined petroleum products.

From the beginning, petitioner's management has sought to vertically integrate its petroleum business. In particular, petitioner has sought to conduct its own exploration, drilling, and production of crude oil and natural gas, refining and wholesale marketing of petroleum products, and the associated gathering, transportation, and distribution of raw materials and refined petroleum products. Petitioner's primary objectives in this regard were to secure a dependable and consistent supply of crude oil for its refineries, to provide its patrons with a full range of high quality petroleum products in an economically efficient manner, to maximize the economic benefits to its patrons, and to reduce its patrons' dependence on profit-seeking oil companies.

Vertical integration in the petroleum production business creates several business risks. Oil exploration and production activities generally require substantial capital investment with no guaranty that exploration will

result in discovery of crude oil deposits.  Moreover, even if a crude oil deposit is discovered, there is no guarantee that it will produce significant reserves.  There is also no guaranty that oil and gas reserves developed by other companies will be available for purchase at an affordable price.  Petitioner's directors were aware of the risks associated with petroleum exploration and production at the time they decided to enter into this activity.

From 1945 until 1970, petitioner explored for crude oil and natural gas through CRA.  CRA was also active in acquiring working properties and undeveloped reserves of crude oil.  These activities were regularly described in petitioner's annual reports.

By 1963, the volume of crude oil processed in petitioners' refineries had increased to over 14 million barrels per year, or approximately 40,000 barrels per day.  At the same time, however, the volume of crude oil produced by petitioner was only approximately 2 million barrels per year.  In petitioner's annual report for 1963, its president and general manager, Mr. Homer Young, stated that petitioner had launched a program to increase its crude oil production.  Petitioner's ultimate goal was to produce 20,000 barrels of crude oil per day, or approximately 50 percent of its refineries' daily requirements.

By 1967, the funds that petitioner invested in petroleum production and refining accounted for petitioner's largest outlay of funds and predepreciation investment in plant and equipment.  Crude oil production and refining facilities represented 44 percent of petitioner's predepreciation investment, compared to 42 percent for fertilizer facilities, and 14 percent for all other facilities.

In May 1967, petitioner purchased most of the oil and gas properties of the AMAX Petroleum Corp. (AMAX). However, despite the purchase of AMAX and additional capital expenditures, petitioner's crude oil production at the end of 1968 was only approximately 5.6 million barrels per year.  At the same time, petitioner's refineries were processing more than 17 million barrels per year.

Petitioner also sought to acquire crude oil by exploring outside the United States.  In December 1960, petitioner formed a wholly owned subsidiary called Cracca Libya, Inc. (Cracca Libya).  Cracca Libya thereafter joined other cooperatives and independent oil producers in a partnership called the Eastern Hemisphere Group (the Group), which was organized to explore for crude oil in North Africa.  In January 1962, the Group participated in forming a private Libyan corporation called the National

Oil Co. of Libya (National Oil) to drill oil wells in Libya. However, National Oil was unable to secure drilling rights. In 1966, petitioner dissolved Cracca Libya and formed a new subsidiary called CRA International to cooperate with other oil companies in exploring for crude oil and natural gas in Canada.

By 1969, petitioner owned domestic oil producing properties in Kansas, Oklahoma, Texas, Louisiana, and Wyoming. These properties produced for petitioner a combined average of approximately 14,000 barrels of crude oil and 33.5 million cubic feet of natural gas per day. Petitioner was contractually obligated to sell some of this production to unrelated third parties. Petitioner used the remainder to supply its refineries or to exchange with other companies for crude oil more readily accessible by its refineries. Such exchange transactions are common among oil companies.

Petitioner was not able during the 1960's to achieve its goal of producing 50 percent of the crude oil processed in its refineries. The capacity of petitioner's refineries grew faster than its reserves of crude oil. In the late 1960's, petitioner's treasurer, Mr. Donald Ewing, met with an investment banker to determine how much money petitioner would have to invest in crude oil production to achieve its

goal of 50 percent self-sufficiency.  The banker determined that petitioner would have to invest $200 million to achieve this goal.  At that time, the total value of petitioner's assets was only slightly in excess of $300 million.  Although its 50-percent self-sufficiency goal seemed to be unfeasible, petitioner continued to engage in crude oil production activities in an attempt to vertically integrate its petroleum-related business.

Formation and Operation of Terra Resources

During 1969, petitioner's management sought to increase its crude oil production while limiting its expenditure of financial resources.  Management's objective was to increase the portion of CRA's crude oil and natural gas needs that it supplied through existing and new properties and, thereby, to increase its level of self-sufficiency while minimizing its commitment of capital. At that time, petitioner's capital resources were already strained by the expansion of its nonpetroleum facilities. To achieve its objective, petitioner spun off CRA's crude oil production assets into a new wholly owned subsidiary called Terra Resources, Inc. (Terra).

Petitioner's management chose to organize Terra as a commercial corporation and not as a cooperative in order to facilitate raising the capital necessary to fund additional

oil and natural gas exploration.  Petitioner's management also hoped to reduce petitioner's oil exploration costs, to control more of the crude oil processed in its refineries, to stabilize its petroleum production costs, and to increase patronage refunds.  Petitioner was required to seek outside capital because it had assumed a large amount of debt in the process of expanding its other business interests, especially its fertilizer production facilities.

Petitioner's board of directors approved the formation of Terra during its February 4-5, 1970, meeting.  Later in 1970, petitioner's board of directors caused CRA to transfer all of its crude oil production properties and undeveloped acreage to Terra, but to retain its refineries and pipeline system.  Petitioner's management envisioned that Terra would raise capital by periodically selling equity to the public, but that petitioner would retain control of the enterprise by holding at least 51 percent of its outstanding capital stock.  CRA was also to retain the right of first refusal to purchase all of the crude oil produced by Terra at the posted field price.

On or about March 25, 1970, CRA transferred all of its crude oil and natural gas production assets to Terra. On the same day, petitioner transferred to Terra its stock interest in CRA International, Inc., which was conducting

oil exploration and production activities, both directly and through a joint venture named CRA International, Ltd. The net book value of the assets transferred was $31,143,589. In exchange, Terra issued 2,693,015 shares of common stock to CRA and 187,985 shares of common stock to petitioner. In addition, Terra assumed $11.6 million of liabilities that petitioner had assumed incident to its purchase of AMAX in 1967.

On August 31, 1970, CRA purchased an additional 96,998 shares of common stock in Terra for $1,050,000 in cash. At the time CRA transferred its assets to Terra, Terra and CRA entered into a General Conveyance, Assignment, and Transfer Agreement. The agreement identifies the properties transferred by CRA to Terra and the assets that were to remain in CRA's possession. The agreement also granted CRA:

> the prior call and option to purchase all uncommitted crude oil and other liquid or liquefiable hydrocarbons that are produced and saved from the Subject Properties after the Effective Date and from all other oil and gas properties hereafter acquired by [Terra] or its wholly owned subsidiaries or its controlled affiliates, at the posted field price or prices from time to time prevailing for the area in which such properties are located.

During its August 24-25, 1971, meeting, petitioner's board of directors approved the sale of 800,000 shares of

Terra stock to the public at a maximum price of $17.50 per share. The board of directors resolved that the proceeds of this offering should be used "for exploration and/or purchase of oil properties" and to retire a portion of the company's previously incurred debt. On the advice of petitioner's investment bankers, the stock offering was delayed until February 1972. Terra's prospectus, which was released on February 15, 1972, states that Terra "has paid no dividends to date and does not expect to do so in the foreseeable future."

Although petitioner's management had expected to receive approximately $16 per share for the Terra stock, the offering price was only $12 per share, and the offering netted only $4.2 million to Terra after expenses. Terra used $2.3 million of the proceeds of the initial offering to retire existing debt. The remainder, $1.9 million, was added to Terra's working capital. After the offering, petitioner retained 88.2 percent of Terra's outstanding capital stock and members of the public owned 11.8 percent. Petitioner did not make any other public offering of Terra stock.

Although Terra was formed primarily to raise outside capital to support petitioner's oil and gas exploration activities, very little capital was actually raised.

Moreover, Terra's operations presented a potential conflict of interest between petitioner and Terra's other shareholders. Petitioner preferred that Terra use all of its earnings to finance additional crude oil exploration activities. However, if the public shareholders were to receive a return on their investment, some of those earnings would have to be distributed as dividends. During the time that Terra had minority shareholders, it did not pay any dividends, and petitioner did not intend that it do so.

In 1976, petitioner and CRA purchased all of the publicly held capital stock in Terra for $31 per share. This price was based on the appraised value of Terra's assets, and on a fairness opinion prepared by Smith, Barney & Co. Petitioner owned all of Terra's outstanding stock from the date of the repurchase until July 1983 when it sold its entire interest in the company.

Petitioner maintained control over Terra from the time of its formation until 1983. Most of Terra's directors were also officers or directors of petitioner. Terra's president attended regular staff meetings held by petitioner's vice president in charge of petroleum activities. Pursuant to resolutions adopted by petitioner's board of directors during its March 31-

April 1, 1970, and October 27-28, 1970, meetings, Terra's employees were permitted to participate in petitioner's employee incentive and investment savings plans, retirement plans, executive deferred compensation plans, and management performance plans.

Petitioner intended Terra to operate at a profit. Petitioner's and Terra's management jointly prepared Terra's proposed budgets. One of petitioner's vice presidents, Mr. William Rader, also worked with each of Terra's operational units in developing separate budgets. Terra's capital and operating budgets were considered for approval at annual budget meetings of petitioner's board of directors and senior management and ultimately were approved by petitioner's board of directors. Terra's and petitioner's management also jointly prepared business plans for approval by Terra's board of directors. Petitioner charged fees for the administrative and other services it provided to Terra and charged interest at the fair market rate when it lent money to Terra.

Petitioner did not file a consolidated Federal income tax return with any of its subsidiaries, including Terra, during any of the years in issue. Terra's separate Federal income tax returns were signed by officers or employees of Terra. Terra maintained separate books and records to

facilitate the preparation of its tax returns.  Terra also prepared its own accounting records, which were subsequently reviewed by employees of petitioner.

Terra began to acquire and develop new properties and sources of crude oil immediately after its formation. This increased the volume of crude oil available to CRA's refineries.  The crude oil that was produced by Terra that was not contractually committed to third parties (its uncommitted production) was made available to CRA either for delivery to its refineries or for exchange with other oil companies in return for crude oil more readily accessible by a CRA refinery.  Terra did not employ any personnel for marketing its uncommitted production. Employees of petitioner or CRA arranged on Terra's behalf for the purchase and delivery of crude oil to CRA refineries, for exchange with other oil companies, and for the sale of uncommitted production not delivered to or exchanged for the benefit of CRA.

Throughout the 1970's, petitioner consistently budgeted substantial amounts of money for its petroleum-related business and crude oil exploration operations. However, petitioner never reached its goal of producing 50 percent of the crude oil processed in its refineries.  In

1978, Terra's vice president of finance testified before a
U.S. Department of Energy board:

> Terra is responsible to [petitioner] for the
> exploration, development and production of as
> high a percentage as possible of the crude oil
> and natural gas needed as raw materials for
> [petitioner's] refineries and fertilizer
> manufacturing plants.  Terra's specific goal
> over the next five years is to materially
> increase the 14 percent of [petitioner's] oil
> and gas raw material needs as it is now
> supplying.

Between fiscal years 1971 and 1975, total expenditures for
the acquisition and development of new producing properties
increased from $3,239,601 annually to $13,694,678.  Terra
spent $13,403,739 on the acquisition and development of
production properties during the 6-month period ending
February 29, 1976, alone.  During its 1975 fiscal year,
Terra purchased producing properties for a total cost of
$29,098,615.  This added approximately 6,718,500 barrels of
crude oil and 16,123,700 million cubic feet of natural gas
to Terra's reserves.  Between fiscal years 1971 and 1975,
Terra's production of crude oil, including its share of the
production of CRA International, decreased from a high of
4,345,600 barrels in fiscal year 1971, to a low of
3,805,238 barrels in fiscal year 1973, before increasing
again to 4,070,748 barrels in fiscal year 1975.

Between fiscal year 1971 and February 29, 1976, Terra's reserves, including those held by a subsidiary and a joint venture, increased from 25,486,542 barrels of crude oil and 92,050 million cubic feet of natural gas to 31,052,598 barrels of crude oil and 131,616 million cubic feet of natural gas.

In 1978, Mr. Rader became primarily responsible for petitioner's petroleum operations.  From 1978 until 1980, Mr. Rader held various positions with both Terra and petitioner.  Prior to Mr. Rader's employment, Terra focused primarily on acquiring established producing properties.  However, Mr. Rader believed that it was in petitioner's best interest to combine all of its production activities into one company and to shift its emphasis and focus on exploring for new properties.  Under Mr. Rader's direction, Terra hired a number of geologists, geophysicists, and other personnel needed for crude oil exploration.  Terra also expanded its operations into new geographical areas and began offshore exploration activities.

On September 1, 1977, Terra sold all of the common stock it held in Northern Terra Resources, Inc., which owned oil producing assets in Canada.  During 1977, Terra also sold production assets located in North Dakota.

Terra obtained the funds necessary for capital expenditures from its own internal cash-flow. Terra always retained its profits for operating capital. At the end of its fiscal year 1982, Terra's balance sheet showed retained earnings of approximately $92 million. Terra's other source of funds was loans from petitioner and other affiliates. By the end of 1981, the outstanding balance of the loans petitioner and other affiliates had made to Terra was $120,557,651.

Terra's oil and gas acquisition and development expenditures for 1977 through 1982 were as follows:

| Year | Expenditures (in Millions) |
|------|----------------------------|
| 1977 | 43.300 |
| 1978 | 54.900 |
| 1979 | 50.300 |
| 1980 | 75.700 |
| 1981 | 88.800 |
| 1982 | 85.628 |
| Total | 398.628 |

From 1970 to 1983, Terra consistently retained its full share of the uncommitted production of wells in which it held an ownership interest and sought to acquire as much of the crude oil held by its co-owners or subject to contractual obligations as possible. Sales of uncommitted production to parties other than petitioner, other than those incident to exchanges for CRA's benefit, were

unusual. Of the amount of crude oil processed by the CRA refineries, the percentage that was produced by Terra is petitioner's self-sufficiency. The self-sufficiency ratio for an integrated oil company is the ratio of the quantity of the crude oil produced by the company to the quantity of crude oil processed by its refineries.

At no time during its existence did Terra and the other exploration subsidiaries meet petitioner's goal of obtaining a 50-percent self-sufficiency ratio, that is, of producing 50 percent of its refineries' needs. The volume of crude oil processed at CRA's refineries, and the volume of such crude oil that was produced by Terra from 1971 to 1982 were as follows:

| Year | Crude Processed at CRA Refineries (Barrels per day)[1] | Crude Produced By Terra (Barrels per day) | Self-sufficiency Ratio |
|------|-----|-----|-----|
| 1971 | 52,085 | 11,904 | 22.85 |
| 1972 | 53,852 | 11,555 | 21.46 |
| 1973 | 51,997 | 10,425 | 20.05 |
| 1974 | 56,959 | 11,033 | 19.37 |
| 1975 | 62,271 | 11,312 | 18.17 |
| 1976 | 68,527 | 13,249 | 19.33 |
| 1977 | 71,756 | 13,455 | 18.75 |
| 1978 | 71,926 | 12,636 | 17.57 |
| 1979 | 76,167 | 11,597 | 15.23 |
| 1980 | 71,434 | 10,937 | 15.31 |
| 1981 | 68,896 | 10,310 | 14.96 |
| 1982 | 55,932 | 9,984 | 17.85 |

[1] This does not include amounts refined at the NCRA refinery, of which petitioner was part owner.

Petitioner's goal of 50 percent self-sufficiency did not represent an industry standard or have a particular economic motive. The decline in self-sufficiency between

1971 and 1982 was caused by a combination of decreases in the amount of crude oil Terra produced and increases in the amount of oil CRA processed.

Because Terra was contractually obligated to sell a portion of the crude oil it produced to third parties, petitioner's true self-sufficiency was actually lower than the self-sufficiency ratios listed above.  True self-sufficiency refers to the percentage of crude oil processed by CRA that had been produced by Terra and made available for processing in CRA's refineries.  The volume of crude oil processed in CRA's refineries, the volume of crude oil produced by Terra, the percentage of Terra's crude oil utilized in CRA's refineries, the volume of Terra's crude oil used in CRA's refineries, and petitioner's true self-sufficiency from 1971 to 1982 are as follows:

| Year | Crude Processed By CRA | Crude Produced By Terra | Amount Of Product Utilized | Actual Crude Used By CRA | True Self-Sufficiency |
|------|------------------------|-------------------------|----------------------------|--------------------------|-----------------------|
| 1971 | 52,085 | 11,904 | 40.80% | 4,857 | 9.32% |
| 1972 | 53,852 | 11,555 | 51.80% | 5,985 | 11.11% |
| 1973 | 51,997 | 10,425 | 43.50% | 4,535 | 8.72% |
| 1974 | 56,959 | 11,033 | 65.20% | 7,194 | 12.63% |
| 1975 | 62,271 | 11,312 | 70.20% | 7,941 | 12.75% |
| 1976 | 68,527 | 13,249 | 56.00% | 7,419 | 10.83% |
| 1977 | 71,756 | 13,455 | 67.00% | 9,015 | 12.56% |
| 1978 | 71,926 | 12,636 | 69.00% | 8,719 | 12.12% |
| 1979 | 76,167 | 11,597 | 72.00% | 8,350 | 10.96% |
| 1980 | 71,434 | 10,937 | 87.00% | 9,515 | 13.32% |
| 1981 | 68,896 | 10,310 | 97.00% | 10,001 | 14.52% |
| 1982 | 55,932 | 9,984 | 96.00% | 9,585 | 17.14% |
| Average | 62,446 | 11,632 | 67.96% | 7,760 | 12.17% |

Terra's crude oil reserves totaled 22.3 million barrels, or 6.12 years of production, as of August 31, 1982.  On the same date, petitioner's balance sheet showed investment in oil and gas properties of $619,990,000.  This constituted 35 percent of petitioner's total investment in property, plant, and equipment.

At all relevant times, Terra's operating results, assets, and liabilities were included in petitioner's consolidated financial statements submitted to the Securities and Exchange Commission, its member-patrons, and its creditors.  Each of petitioner's annual reports included a discussion of Terra's operations.  However, petitioner's consolidated financial statements did not disclose its interest in Terra.  Petitioner's and CRA's separate and unconsolidated financial statements listed the Terra stock in an asset account entitled "Investments in

Subsidiaries".  During the period when members of the public held Terra stock, the interest of the public was reflected in the "Minority Owners' Equity in Subsidiaries" section of petitioner's consolidated balance sheet, and in the "Costs and Expenses" section of its consolidated statements of operations.  Each prospectus and SEC Form 10-K filed by petitioner from 1970 until the date it sold Terra included a detailed summary of petitioner's relationship with Terra.

Neither petitioner nor CRA offered Terra stock for sale in the ordinary course of its trade or business, and neither ever recorded the Terra stock in an account identified as a "hedge", "hedging", or "inventory" account. Petitioner never referred to the Terra stock as a hedge against increases in the price of petroleum products, although risk reduction was one of petitioner's reasons for forming Terra.  Prior to July 1983, neither petitioner nor CRA sold any Terra stock.  Terra did not pay any dividends to petitioner prior to May 1983.  Terra's cash flow was used exclusively to finance additional exploration and production activities.

Other Exploration and Production Activities

Petitioner and CRA formed two other companies during the period from 1970 to 1983 for the purpose of exploring

for crude oil.  Beginning in 1973, CRA acquired in its own name interests in oil and gas properties in Texas, Montana, Louisiana, Nebraska, Oklahoma, and Wyoming.  On March 1, 1976, these interests, as well as Federal leases, were transferred to a newly formed company called CRA Oil Exploration Co.

On January 28, 1975, CRA purchased 90 percent of the capital stock of Cayman International Co., which was engaged in exploring for crude oil in Colombia, South America.  Cayman International Co. was later renamed Farmland International Energy Corp. (FIEC) and began operating in the United States.

FIEC was merged into Terra during petitioner's 1978 fiscal year.  CRA Oil Exploration Co. was merged into Terra on or about May 1, 1980.  Terra was the only subsidiary of petitioner engaged in oil and gas exploration from the date of this merger until 1983 when petitioner sold its interest in Terra.

## Sale of Terra

Sales of petitioner's petroleum-based products declined rapidly between 1980 and 1983.  Petitioner's refinery margins, earnings from fertilizer sales, and overall net earnings also declined during this period.  As a result, petitioner reported consolidated losses in 1982

and 1983 for the first time in its history.  Petitioner's
management attributed the company's poor performance to
the end of the energy crisis and resulting glut of oil,
worldwide over-production of grains, high interest rates,
and the Federal Government's implementation of the payment-
in-kind program, which caused a general decrease in the
production of many agricultural commodities.  Petitioner's
members were also adversely affected by a general recession
in the agricultural sector of the economy during this
period.  Petitioner's consolidated financial data regarding
the company's farm supply operations for the period from
1980 to 1983 are as follows:

|  | 1980 | 1981 | 1982 | 1983 |
| --- | --- | --- | --- | --- |
| Gross farm supply revenue | $2,725 | $3,040 | $2,775 | $2,546 |
| Farm supply operating savings | 273 | 187 | 90 | 2 |
| Total net savings[1] | 202 | 68 | (32) | (138) |
| Interest expense | 92 | 105 | 122 | 106 |
| Funded long-term debt | 584 | 684 | 795 | 566 |
| Fixed assets before depreciation | 1,410 | 1,655 | 1,787 | 1,149 |

[1]Total net savings before income taxes, patronage refunds, and
extraordinary items.

During the period from 1981 to 1983, petitioner's
operating and capital needs were met primarily through a
combination of bank financing on a floating-rate basis,
issuance of medium- and long-term subordinated debt, and
retained earnings, including patronage dividends not paid
in cash.  During this period, petitioner's loans from the

Wichita Bank were the largest in the national Farm Credit System. As of August 31, 1982, petitioner's consolidated loans from the Wichita Bank and commercial banks totaled over $500 million. As of the same date, petitioner's outstanding subordinated debt certificates had reached an all-time high of approximately $428 million.

Prior to 1982, petitioner's loan agreements with the Wichita Bank contained covenants designed to ensure petitioner's continued solvency. Under these covenants, petitioner was required to maintain a funded debt ratio (subordinated debt instruments divided by total capitalization) of no more than 65 percent. Petitioner was also required to maintain a current ratio (current assets to current liabilities) of at least 1.15:1. In late 1981, the Wichita Bank took the position that more conservative ratios were necessary to ensure petitioner's financial stability. In a loan agreement effective February 15, 1982, petitioner agreed that by August 31, 1982, its funded debt ratio would not exceed 62.5 percent, and that its current ratio would be at least 1.20:1.

Shortly after adopting its budget for the 1982 fiscal year, which projected lower operating savings than had been realized in 1981, petitioner requested that the funded debt ratio agreed upon in the February 15, 1982, loan agreement

be increased to 65 percent with a reduction to 61 percent to be effective on August 31, 1983. The Wichita Bank agreed to this change because the bank wanted to avoid a potential default, and because it appeared unlikely that petitioner would quickly recover from its recent financial difficulties. Both petitioner and the Wichita Bank contemplated that when the loans were considered for renewal in February 1983, the maximum funded debt ratio for August 31, 1983, would likely be reduced to 61 percent.

By August 1982, petitioner's financial personnel were projecting a loss for fiscal year 1982 of $35 million, compared to savings of $46.4 million which had been projected when the budget was prepared. For fiscal 1983, petitioner's financial personnel forecasted losses of $41 million through February 1983, and savings of $87 million for March through August 1983.

At a September 10, 1982, meeting between petitioner's representatives and officials of the Wichita Bank, petitioner asked the Wichita Bank to consider changing the current ratio requirement in its loan agreements from 1.20:1 to a flat amount of $75 million in working capital. However, the Wichita Bank refused to consider any changes in the current ratio requirement until petitioner made a long-range evaluation of other debt-reducing possibilities,

including the possibility of selling major assets or business segments.

The Wichita Bank became increasingly concerned about petitioner's financial situation throughout the early 1980's. An internal memorandum of the Wichita Bank dated September 2, 1982, states that "Farmland Industries is experiencing serious financial difficulties." A memorandum dated September 14, 1982, states that petitioner's vice president of finance, Mr. Robert Ferguson, informed a representative of the Wichita Bank that petitioner was having difficulty dealing with commercial banks. Mr. Earl Knauss, petitioner's chief financial officer, was also reported to have stated that petitioner needed to develop financial contingency plans to avoid defaulting on its loans from the Wichita Bank. On September 16, 1982, Mr. Ferguson told the Wichita Bank that the banking firm that previously handled petitioner's debt offerings had ceased doing so. On October 19, 1982, a vice president of the Wichita Bank proposed that the bank classify petitioner's loan as a problem loan and suggested that petitioner consider selling assets and subsidiaries to raise cash and reduce its interest expenses.

During a meeting of petitioner's board of directors on October 25-27, 1982, the board was informed that the

estimated financial results for fiscal year 1983 had been revised from savings of $46.4 million to a loss of $18.4 million. During the same meeting, Mr. David Andra, senior vice president of the Wichita Bank, informed petitioner's board of directors that the Wichita Bank had classified the company's loan as a problem loan. Terra's president, Mr. Francis Merelli, also reported that Terra was exploring the possibility of selling leasehold interests pursuant to authorization by petitioner's board of directors to sell up to $50 million of Terra's reserves to raise cash.

In December 1982, the Wichita Bank proposed to change petitioner's loan covenant ratios effective February 1983, to require that the funded debt ratio would be no more than 62 percent by August 31, 1983, and no more than 64 percent during the period from February 15 through August 31. Petitioner resisted this proposal.

Petitioner's financial difficulties continued into 1983. Early in the year, petitioner's board of directors decided to sell the company's stock in Terra to avoid default on the Wichita Bank loans and potential bankruptcy. At a January 28, 1983, meeting of representatives of the Wichita Bank and petitioner, petitioner revealed that its projected loss for 1983 had increased to $64.7 million. Furthermore, Mr. Knauss reported that the net loss could

be as high as $98.7 million due to unanticipated write-downs and other factors. At that level of loss, the funded debt ratio would have increased to 66.4 percent. Mr. Knauss also advised officials of the Wichita Bank that petitioner's management had recommended selling a major asset to reduce debt.

At its meeting of February 1-2, 1983, petitioner's board of directors accepted Mr. Knauss's recommendation to sell a major asset. In view of this decision, the Wichita Bank agreed to allow petitioner's funded debt ratio to remain at 65 percent through August 31, 1983, but insisted that it be reduced to 62 percent by September 1, 1983. The current ratio requirement was also relaxed for the period ending August 31, 1983, to an absolute working capital level of $75 million. Petitioner's current ratio as of February 28, 1983, was 1.17:1.

Petitioner's projected losses continued to increase throughout February and March 1983. An internal memorandum of the Wichita Bank dated March 4, 1983, states that petitioner "is firmly committed to selling assets to strengthen [its] operations." Another memorandum of the Wichita Bank prepared on the same day states that petitioner's financial problems "exceed the worst case projections." A memorandum of the Wichita Bank dated

April 18, 1983, states that petitioner was planning a massive sale of assets to improve its overall financial condition. Without such a sale, the Wichita Bank feared that petitioner would default on its loans before August 31, 1983.

By mid-April 1983, petitioner's loss estimate for 1983 had increased to between $140 million and $154 million. A memorandum of the Wichita Bank dated April 25, 1983, discussing a meeting between representatives of petitioner, the Wichita Bank, and the Central Bank for Cooperatives, states that the banks would work to avoid a default, but "the sale of Terra * * * was certainly more of a temporary cure than [petitioner] planned in the beginning." On May 31, 1983, petitioner's current ratio was 1.15:1. On the same date, petitioner's funded debt ratio was 63.8 percent.

At the time of petitioner's 1982-83 financial crisis, petitioner's stock in Terra was the only asset that could be sold quickly to pay down debt to the extent required by the Wichita Bank. In the spring of 1983, petitioner's management and board of directors concluded that selling the company's stock in Terra was the only feasible course of action. The board of directors had never discussed selling the Terra stock prior to petitioner's financial

crisis, and petitioner would not have sold the stock if it had not experienced financial difficulties.

Petitioner solicited bids for Terra's stock in May 1983. Petitioner required prospective buyers to purchase 100 percent of Terra's stock for cash, and to agree to grant petitioner a call on Terra's crude oil production.

The Pacific Lighting Corp. (PLC) submitted the highest bid for the Terra stock. In June 1983, petitioner agreed to sell the stock to PLC for $298.3 million. PLC regarded the sale price as reflecting the fair market value of Terra's crude oil reserves and other assets. The price was established by evaluating the reserves, projecting Terra's production schedule 20 years into the future, and discounting the projected cash flow to present value.

Petitioner's sale of Terra stock was closed on July 28, 1983. PLC paid approximately 50 percent of the purchase price at closing, and the balance on September 1, 1983. Petitioner distributed the cash it received from the sale to the Wichita Bank in partial payment of petitioner's outstanding loans. This improved petitioner's overall financial health and benefited its balance sheet and future years' profit and loss statements.

Petitioner reported the gain from its sale of Terra stock under the installment method. Petitioner reported

total gain of $118,896,624 on its return for the taxable year ending August 31, 1983, $118,191,603 on its return for the taxable year ending August 31, 1984, and $879,783 on its return for the taxable year ending August 31, 1986. The gain reported for fiscal year 1986 resulted from payments arising from various post-sale agreements between petitioner and PLC.  Petitioner did not report any gain from the sale on its return for the taxable year ending August 31, 1985.

During the years in issue, petitioner maintained a total of approximately 20 allocation units for the purpose of calculating patronage refunds.  From its accounting records of merchandise sold, petitioner determined the member sales and nonmember sales attributable to each allocation unit.  Petitioner defined a member sale as a sale of property or services to a person or entity entitled to receive patronage dividends.  This includes sales to members, associate members, and certain nonmembers who are entitled to receive patronage dividends under contractual arrangements.  Petitioner defined a nonmember sale as a sale of property or services to a person or entity who is not entitled to receive patronage dividends.

In 1983 and 1984, petitioner's bylaws required that patronage income be determined on the basis of taxable income rather than book income.  The determination of patronage income was divided into five steps.  First, the total sales for each allocation unit was determined.  Second, the ratios of member and nonmember sales to total merchandise sales for each allocation unit were determined.  Third, the gross savings for each unit was determined by subtracting the cost of goods sold from total merchandise sales.  Fourth, the direct expenses for each allocation unit that did not enter into the cost of goods sold computation, such as marketing and warehousing, were subtracted from gross savings to compute "net savings before adjustments".  If the resulting figure was positive, then it was reduced by the unit's allocable portion of petitioner's general and administrative expenses and the losses of units with negative net savings before adjustments.  The resulting figure constituted the net savings for the particular unit.  Fifth, the net savings for each unit were allocated between members and nonmembers by applying the ratios determined above in step two.

Petitioner treated the entire gain realized on the sale of Terra stock as ordinary income.  Petitioner

allocated a portion of the gain to each of its four petroleum-related allocation units (bulk petroleum, farm fuels, propane, and lube oil and grease). The portion of total gain allocable to each unit was determined by the ratio of gross savings allocable to such unit to the combined gross savings of all four units.

Applying the patronage income computation formula described above, petitioner reported all but approximately 6 percent of the gain from the sale of Terra stock as patronage income in 1983, and all but approximately 9 percent as patronage income in 1984. All of the gain reported in 1986 was treated as patronage income. On its return for the taxable year ending August 31, 1983, the gain reported as patronage income was entirely offset by current and unutilized prior years' losses from patronage operations. Part of the gain reported on petitioner's return for the taxable year ending August 31, 1984, was also offset by patronage losses.

Several transactions took place between petitioner and Terra prior to and in anticipation of the sale of Terra stock. On May 19, 1983, Terra paid a $20 million dividend to petitioner. On the same day, petitioner paid $21 million to the Fourth National Bank & Trust Co. in Tulsa, Oklahoma, in payment of a loan Terra had previously

made to petitioner.  At the time of these transactions, Terra owed petitioner a total of $150 million.  Petitioner claimed a deduction pursuant to section 243 equal to the entire amount of the cash dividend received from Terra. The May 1983 dividend was not intended to offset an increase in the price of crude oil or natural gas. Because the dividend was excluded from petitioner's income under section 243, it did not enter into petitioner's calculation of patronage income for its 1983 fiscal year.

In July 1983, Terra paid another dividend, transferring to petitioner its interest in the Axom Limited Partnership, which was valued at $4,797,890.  Petitioner received and reported as income an additional $161,573 in dividends from Terra during its 1983 tax year.  It reported both of these dividends as patronage income. Petitioner reported the dividends it received with respect to all other stock as nonpatronage income.

Petitioner did not sell its Terra stock because of any increase or decrease in the market price of crude oil or natural gas, or any contemporaneous purchase of crude oil or natural gas on the open market.  Petitioner exercised its option to purchase crude oil produced by Terra several times between the date of the sale and the time of trial.  Although the call option has benefited

petitioner, Terra has not been a desirable source of crude oil since the sale. When petitioner owned Terra, it had the right to purchase crude oil at the posted field price regardless of whether other buyers would be willing to pay a higher price. After the sale, petitioner was forced to compete for the crude oil and natural gas Terra produced. Petitioner was unable to purchase Terra's oil and gas on several occasions due to the fact that other purchasers were willing to pay a premium over the posted field price. Petitioner has also encountered difficulty in arranging delivery of oil from Terra. Further difficulties arose after Terra sold some of its properties to unrelated third parties. Terra retained a call option for petitioner's benefit with regard to the oil produced at these properties which led to some confusion over deliveries.

Seaway Pipeline, Inc.

In July 1974, CRA and six unrelated companies organized Seaway Pipeline, Inc. (Seaway). At the time of its organization, all of Seaway's shareholders were engaged in oil refining. Two of the other shareholders were regional cooperatives, and four were for-profit corporations.

Seaway was organized to construct and operate a pipeline and related terminal facilities for the

transportation of crude oil from Freeport, Texas, to Cushing, Oklahoma. Pipelines owned by entities other than Seaway connected the Cushing, Oklahoma, terminal with the refinery facilities of Seaway's shareholders. The pipeline was operated as a common carrier under Federal law. The stockholders intended to use the pipeline to carry imported crude oil part of the distance from Freeport to their refineries. At the time of construction, the shareholders expected that they would be the principal users of the pipeline, and that nonshareholders would account for approximately 21 percent of the pipeline's usage.

The total projected cost of the Seaway pipeline was $204.4 million. Approximately 10 percent of the cost was to be financed by equity capital contributed by the shareholders. The remainder was to be financed through the sale of commercial paper and long-term debt through private placements. By December 31, 1977, Seaway had issued long-term debt in the aggregate principal amount of $167.6 million.

Pursuant to an agreement among the Seaway shareholders dated July 22, 1974, petitioner contributed $2,299,595 to Seaway as consideration for the issuance of Seaway stock.

Petitioner owned 12 percent of Seaway's capital stock from the company's inception until its termination in 1984.

To ensure payment of Seaway's long-term debt, its stockholders executed a Throughput and Deficiency Agreement (TDA) dated February 12, 1975.  Under the terms of the TDA, each stockholder agreed to deliver sufficient crude oil for transportation through the pipeline, in proportion to its capital stock ownership, so that revenues collected for the transportation would pay all operating expenses of the pipeline and all principal and interest due on Seaway's outstanding debt.  In the event Seaway experienced a cash deficiency, the TDA obligated each shareholder to pay Seaway its proportionate share of the deficiency on the date any interest or principal payment was due, or at the end of any 6-month accounting period.  Seaway and its shareholders treated these TDA deficiency payments as prepaid transportation charges, to be credited against actual charges when crude oil was transported for the paying shareholder.  On its balance sheet, petitioner credited its TDA deficiency payments to an account for prepaid expense items and debited the payments to an expense account when it actually used the pipeline.

The Seaway pipeline became operational on November 23, 1976.  Petitioner used the pipeline to transport approximately 50 percent of the crude oil processed at its Coffeyville refinery, which was connected to the Cushing terminal by another pipeline owned by petitioner.  The Seaway pipeline also gave petitioner access to foreign crude oil needed to operate its refineries.

For financial accounting purposes, petitioner, through CRA, recorded its Seaway stock on its balance sheet in an account labeled "Other Investments".  Neither petitioner nor CRA recorded the Seaway stock in an account identified as an "inventory", "fixed assets", "hedge", or "hedging" account.  Petitioner did not hold its stock in Seaway for sale in the ordinary course of business and did not sell any Seaway stock or receive any stock dividends.  For financial reporting purposes, petitioner's share of Seaway's annual earnings or losses was reflected as adjustments to a balance sheet asset account and a balance sheet schedule entitled "Investments in Equity and Earnings of, and Dividends Received from Affiliates and Other Persons--(A) Capital Stock".

Although Seaway incurred operating losses in 1976, 1977, and 1979, it had sufficient pipeline transportation revenues and cash reserves in each of those years to pay

its operating expenses and service its debt.  However, pipeline usage declined steadily from 1979 to 1983.  Seaway transported the following volumes of crude oil during those years:

| Year | Barrels of Crude Transported |
|------|------------------------------|
| 1979 | 59,294,000 |
| 1980 | 37,015,000 |
| 1981 | 23,400,000 |
| 1982 | 10,817,000 |
| 1983 | 12,663,000 |

This decrease in pipeline usage caused Seaway to experience a shortage of cash and forced the company to make cash calls pursuant to the TDA between 1980 and 1983. Petitioner's portion of the cash calls totaled $11,844,791. Of this amount, approximately $1,327,427 was ultimately applied to transportation charges for crude oil transported through the pipeline on petitioner's behalf.

In 1983, Seaway's board of directors decided to sell the pipeline.  Seaway later agreed to sell the pipeline to Phillips Petroleum (Phillips), one of its shareholders, for $127.6 million.  Phillips also agreed to purchase the port terminal facilities for $15 million.  Seaway sold the Cushing terminal to Amoco Oil Co. for $10.2 million. Petitioner's annual report for 1984 describes the sale of the pipeline as follows:

During fiscal 1984, the Seaway Pipeline Co. sold its Freeport, Tex., to Cushing, Okla., crude oil pipeline. Seaway was organized in the mid-70s to transport foreign crude oil from the Texas Gulf Coast to Midwest refineries. Farmland was a 12% owner of the Seaway facilities. With less need for foreign crude oil in the Midwest, the pipeline was no longer beneficial to Farmland's refining operations.

The sale of the pipeline was closed on May 1, 1984. Following the closing, Seaway's shareholders agreed to make short-term loans to Seaway of up to $15 million to cover operating expenses pending dissolution. Seaway was to repay these loans with the proceeds of the sale of the terminal facilities. In total, the shareholders lent Seaway $11,100,000. Petitioner's share of this loan was $1,332,000.

The sale of terminal facilities closed in July and August 1984. Seaway ceased conducting business on August 31, 1984. Seaway used the proceeds from the sales of the pipeline and terminal facilities to repay its remaining debts to nonshareholders, the full amount of the short-term loans made by the shareholders, a portion of the shareholders' unapplied prepaid transportation charges, and the shareholders' respective shares of the cost of oil remaining in the pipeline at the time it was sold.

On its 1984 Federal income tax return, petitioner reported an ordinary patronage loss from the Seaway

transaction of $11,042,128.  This amount was calculated as
follows:

| | | |
|---|---:|---:|
| Estimated total amount received incident to liquidation | | $3,498,052 |
| Unrecovered prepaid transportation advances | ($10,517,364) | |
| Inventory in pipeline | (343,195) | |
| Outstanding loan balance (including accrued interest, $48,026) | (1,380,026) | |
| Cost of capital stock | (2,299,595) | |
|    Total | | (14,540,180) |
| Net loss reported | | (11,042,128) |

Petitioner actually received $3,582,062 upon the liquida-
tion of Seaway because the final payments received in 1985
totaled $358,350, rather that the amount originally
estimated, $274,340.  Petitioner's amount received from
the liquidation was calculated as follows:

| | |
|---|---:|
| Inventory in pipeline | $343,195 |
| Outstanding loan balance (including $48,026 accrued interest) | 1,380,026 |
| Recovery of unapplied prepaid transportation charges--1984 | 1,500,491 |
| Recovery of unapplied prepaid transportation charges--1985 | 358,350 |
| Total amount received | 3,582,062 |

In the subject notice of deficiency, respondent
determined that the portion of the net loss attributable
to the cost of Seaway's capital stock, $2,299,595, is a
nonpatronage capital loss.  The notice describes this
adjustment as follows:

The loss realized on the sale of the Seaway
Pipeline, Inc., stock must be recognized as
nonpatronage capital loss and may not be offset
by patronage income.  Accordingly, your non-
patronage capital losses are increased by
$(2,299,595); the patronage ordinary loss you
reported is decreased by $2,082,785; and the
nonpatronage ordinary loss you reported is
decreased by $216,810, in your fiscal year
ending August 31, 1984.

Mex-Am Crude Corp.

In an attempt to expand its access to crude oil from
sources outside the United States, petitioner became one
of nine equal subscribers to the capital stock of the Mex-
Am Crude Corp. (Mex-Am).  All of these subscribers were
companies that engaged in refining crude oil and required
reliable access to adequate supplies of crude.  Mex-Am was
incorporated on September 17, 1982.  It was organized to
purchase oil in large volumes from Petroleos Mexicanos
(PEMEX) on a collective basis for the benefit of its
shareholders.  Each of Mex-Am's shareholders was obligated
to purchase a portion of the crude oil Mex-Am acquired
from PEMEX.  This obligation terminated if at any time a
shareholder surrendered its stock for no consideration.

Petitioner did not hold its Mex-Am stock for sale in
the ordinary course of business.  For financial reporting
purposes, petitioner reported its stock in Mex-Am in an
account on its balance sheet labeled "Other Investments".

Petitioner never recorded its Mex-Am stock in an account identified as an "inventory", "hedge", or "hedging" account.  Petitioner never sold any Mex-Am stock and never received any dividends from Mex-Am.

Supply conditions for crude oil improved in late 1983 making it unnecessary for petitioner to obtain crude oil from Mex-Am.  Accordingly, petitioner surrendered its stock in Mex-Am for no consideration, thereby relieving itself of the obligation to purchase a portion of Mex-Am's crude oil.

On its Federal income tax return for 1984, petitioner reported an ordinary loss of $25,000 from the surrender of its Mex-Am stock.  Petitioner treated $22,643 of this amount as an ordinary patronage loss and $2,357 as an ordinary nonpatronage loss.

In the notice of deficiency, respondent recharacterizes the loss as a nonpatronage capital loss that cannot be offset by patronage income.  The notice of deficiency describes this adjustment as follows:

> The loss realized on the surrender of the Mex-Am
> Crude Corporation stock must be recognized as
> non-patronage capital loss and may not be offset
> by patronage income.  Accordingly, your non-
> patronage capital losses are increased by
> $(25,000); the patronage ordinary loss you
> reported is decreased by $22,643; and the non-
> patronage ordinary loss you reported is

decreased by $2,357, in your fiscal year
ending August 31, 1984.

Lamont Gas Processing Plant

For many years, petitioner purchased propane and gasoline blending stocks from outside suppliers. The quality of this fuel was often inconsistent, and there was often an inadequate supply to meet the needs of petitioner's patrons. To address these problems, petitioner decided to manufacture propane and gasoline blending stock. In 1963, petitioner purchased a natural gas gathering system near Lamont, Oklahoma, to implement this plan. After the purchase, petitioner installed an absorption processing plant on the site. The facility also included an extensive pipeline system which provided petitioner access to numerous natural gas producing wells. In 1981, petitioner added a cryogenic gas processing plant to its facilities at Lamont which significantly enhanced the plant's efficiency. We refer to the gathering system, the absorption processing plant, the pipeline system, and the cryogenic plant collectively as the Lamont gas plant.

In June 1984, petitioner sold the assets composing the Lamont gas plant to Union Texas Products Corp. for $27.1 million. The sale was an arm's-length transaction. Petitioner used $16 million of the proceeds to build and

expand similar gas gathering and processing plants in

Texas.   The balance of the proceeds was used to reduce

petitioner's outside debt and free up funds for operating

purposes.   Petitioner's annual report for 1984 describes

the sale as follows:

> Farmland sold its gas products plant at Lamont, Okla.  Funds generated from the sale are being used to expand gas plants at Mertzon and Eldorado, Tex.

> The Lamont plant had been processing about 15 million cubic feet of natural gas per day. Eldorado-Mertzon, with a much larger pipeline gathering system, processed 75 million cubic feet per day in 1984.  The expansion, completed in October 1984, will boost capacity to 100 million cubic feet per day in 1985.

The annual report states that the sale took place to

finance the expansion of the Texas plants after "feasi-

bility studies pointed to advantages in expanding the

Mertzon, Texas, natural gas liquids plants."

On its Federal income tax return for the year ending

August 31, 1984, petitioner reported a gain of $16,221,675

from the sale of the Lamont gas plant.   This gain

comprised the following components:

| | |
|---|---|
| Amount realized in excess of cost basis | $12,852,544 |
| Sec. 1245 recapture | 3,287,803 |
| Straight-line depreciation on sec. 1250 property | 81,328 |
| Total reported gain | 16,221,675 |

Petitioner reported the entire gain from the sale of the Lamont gas plant as ordinary patronage income.

In the subject notice of deficiency, respondent reclassifies the portion of the gain representing the amount realized in excess of cost basis, viz $12,852,544, as nonpatronage capital gain under section 1231. Respondent does not take issue with petitioner's treatment of the portion of the gain equal to depreciation recapture under section 1245, $3,287,803, or the portion of the gain equal to the amount of straight-line depreciation on section 1250 property, $81,328. The notice of deficiency describes this adjustment as follows:

> The section 1231 gain realized on the sale of the Lamont, Oklahoma, gas plant must be recognized as non-patronage capital gain and may not be offset by patronage losses. Accordingly, your non-patronage capital gains are increased by $12,852,544; the patronage ordinary income you reported is decreased by $(11,640,781); and the non-patronage ordinary income you reported is decreased by $(1,211,763), in your fiscal year ending August 31, 1984.

Soybean Processing Facilities

Prior to August 1983, petitioner owned and operated three soybean processing facilities. These facilities were located in Sergeant Bluff, Iowa, St. Joseph, Missouri, and Van Buren, Arkansas, and are collectively referred to herein as the soybean facilities. Petitioner

used the soybean facilities to process soybeans purchased from its patrons into soy oil and soy meal. Petitioner sold most of the soy oil it produced to unrelated food processors for use in products such as margarine. Petitioner processed the soy meal it produced into formula livestock feed, all of which it sold to its member cooperatives.

Boone Valley and Land O'Lakes, two other Midwestern cooperatives, also processed and marketed soy products during the years in issue. Boone Valley processed soy meal into livestock feed using petitioner's proprietary formulas and technical support. Boone Valley's feed production was marketed directly through petitioner. Boone Valley is included in a list entitled "subsidiaries and affiliates" in petitioner's 1980 annual report. In some earlier reports, Boone Valley is described as a subsidiary of petitioner and some of its member cooperatives. The record does not fully disclose the nature of the relationship of Boone Valley and petitioner.

During petitioner's 1983 fiscal year, consideration was given to consolidating the soybean operations of petitioner, Boone Valley, and Land O'Lakes. Under the terms of the plan, petitioner was to sell its soybean

facilities to Boone Valley for $29.1 million.  Petitioner was then to purchase Boone Valley's Eagle Grove, Iowa, feed mill for $10 million, and Boone Valley was to change its name to Ag Processing, Inc. (API).  Petitioner, Land O'Lakes, and the former patrons of Boone Valley were to receive all of the equity in API.  The record does not disclose the consideration paid by Land O'Lakes for its interest in API.

The soybean consolidation plan was effectuated in August 1983.  Petitioner's annual report for 1983 states that the consolidation of the three regional cooperatives into a single entity "would [eliminate] some duplication of effort and [create] a stronger cooperative soy processing entity that will improve producers' return." Petitioner estimated that the consolidation would provide additional savings of 3 to 5 cents per bushel for soybean farmers.  Following the consolidation, petitioner's patrons marketed soybeans through API.  API operated the soybean facilities and sold a substantial portion of its output to petitioner for resale to its member cooperatives.

On its Federal income tax return for the year ending August 31, 1983, petitioner reported a gain of $13,791,615 from the sale of its soybean facilities to Boone Valley. This gain was composed of the following components:

| | |
|---|---|
| Amount realized in excess of cost basis | $501,903 |
| Sec. 1245 recapture | 9,963,255 |
| Straight-line depreciation on sec. 1250 property | 3,326,457 |
| Total reported gain | 13,791,615 |

Petitioner reported $3,828,360 of the gain as patronage capital gain under section 1231. This amount consists of the portion of the gain equal to the amount realized in excess of the cost basis ($501,903) and the portion representing the straight-line depreciation taken on section 1250 property ($3,326,457). Petitioner reported the portion of the gain representing section 1245 recapture ($9,963,255) as ordinary patronage income.

In the subject notice of deficiency, respondent reclassifies the portion of gain representing the amount realized in excess of cost basis, $501,903, as nonpatronage capital gain. Respondent does not adjust petitioner's treatment of the portion of the gain representing section 1245 recapture, $9,963,255 (treated as ordinary patronage income), or petitioner's treatment of the portion of the gain representing straight-line

depreciation taken on section 1250 property, $3,326,457 (treated as patronage capital gain).

Miscellaneous Section 1231 Assets

During the tax year ending August 31, 1983, petitioner sold in arm's-length transactions, retired, or otherwise disposed of approximately 525 miscellaneous business assets. These included tractors and other vehicles, livestock, buildings, office furniture, and office equipment. All of these assets were depreciable assets described in section 1231(b), and had been used and disposed of in the ordinary course of petitioner's business activities. On its Federal income tax return for the year ending August 31, 1983, petitioner reported a net gain of $2,142,968 from the disposition of these assets. This gain is comprised of the following components:

| | |
|---|---|
| Amount realized in excess of cost basis | $1,210,245 |
| Aggregate sec. 1245 recapture | 932,723 |
| Total reported gain | 2,142,968 |

Petitioner reported the portion of gain representing aggregate section 1245 recapture, $932,723, as ordinary patronage income. Petitioner reported the portion of the gain representing the amount realized in excess of cost basis, $1,210,245, as patronage capital gain under section 1231.

In the subject notice of deficiency, respondent reclassifies the portion of the gain representing the aggregate amount realized in excess of cost basis, $1,210,245, as nonpatronage capital gain. Respondent does not adjust petitioner's treatment of the portion of the gain representing aggregate section 1245 recapture as ordinary income from patronage sources.

In describing the adjustments involving the gain realized from the sale of petitioner's soybean facilities and the gain from the sale of the above miscellaneous section 1231 assets, the notice of deficiency states as follows:

> The section 1231 gain realized on the sale of the soybean processing facilities must be recognized and treated as non-patronage capital gain and may not be offset by patronage losses. Accordingly, your non-patronage capital gains are increased by $1,712,148; the patronage ordinary income you reported is decreased by $(1,632,724); and the non-patronage ordinary income you reported is decreased by $(79,424), in your fiscal year ending August 31, 1983.

The increase in "non-patronage capital gains" of $1,712,148 determined in the notice consists of $501,903, attributable to the sale of petitioner's soybean facilities, and $1,210,245, attributable to the sale of miscellaneous assets.

OPINION

Petitioner is a nonexempt cooperative subject to subchapter T.  See generally Buckeye Countrymark, Inc. v. Commissioner, 103 T.C. 547, 554-563 (1994), for an overview of the taxation of nonexempt cooperatives under subchapter T.  The principal issue in this case is whether the gains and losses that petitioner realized from the disposition of the property described above should be classified as patronage or nonpatronage gains and losses for purposes of subchapter T.  The property at issue is petitioner's stock in three corporations, Terra, Mex-Am, Seaway, and certain "property used in a trade or business", as defined by section 1231(b), consisting of the assets of petitioner's Lamont gas plant, its soybean processing facilities, and miscellaneous business assets.  The bulk of the deficiencies determined in the notice of deficiency is attributable to respondent's reclassification of the gain from petitioner's sale of the stock of Terra.

The term "patronage dividend" is defined by section 1388(a) as follows:

> (a) PATRONAGE DIVIDEND.--For purposes of this subchapter, the term "patronage dividend" means an amount paid to a patron by an organization to which part I of this subchapter applies--
>
>> (1) on the basis of quantity or value of business done with or for such patron,

(2) under an obligation of such organization to pay such amount, which obligation existed before the organization received the amount paid, and

(3) which is determined by reference to the net earnings of the organization from business done with or for its patrons.

Such term does not include any amount paid to a patron to the extent that (A) such amount is out of earnings other than from business done with or for patrons, or (B) such amount is out of earnings from business done with or for other patrons to whom no amounts are paid, or to whom smaller amounts are paid, with respect to substantially identical transactions.

By patronage income we mean income derived from "business done with or for" patrons of the cooperative, such that it can be included in computing the net earnings from which a patronage dividend can be paid. Sec. 1388(a). By nonpatronage income we mean income that is derived other than from business done with or for patrons. See sec. 1388(a).

Petitioner argues that the classification of gains and losses as patronage or nonpatronage income depends on the factual relationship between the activity producing the gain or loss and the operations of the cooperative, regardless whether the gains or losses are capital or ordinary in nature. Petitioner argues that, if the activity producing the gain or loss is "directly related" to or facilitates the cooperative's operations, then the

gain or loss should be treated as patronage income. Petitioner asks the Court to reject the per se rule espoused by respondent under which capital gains and losses are always classified as nonpatronage. In the event that the Court adopts a per se rule for capital gains and losses, petitioner argues that the gains and losses from its disposition of the stock of Terra, Seaway, and Mex-Am are not subject to such rule because they are ordinary gains and losses "under the long-standing case law principles relating to 'source of supply', noncapital asset 'surrogacy' and 'hedging'." Similarly, petitioner argues that the gains from the disposition of the section 1231 assets, are "'noncapital' assets by statutory definition (under section 1221(2))" and are not subject to respondent's per se rule. Finally, petitioner argues that even if the gains from the sale of Terra stock and the section 1231 assets are classified as nonpatronage income, such income can nevertheless be offset by petitioner's patronage losses which were true operating losses.

Respondent argues that all of the gains and losses at issue in this case are capital in nature and must be automatically classified as nonpatronage under the per se rule prescribed by section 1.1382-3(c)(2), Income Tax Regs. Alternatively, respondent argues that even if the Court

does not adopt the per se rule for capital gains and losses, the gains and losses at issue must be classified as nonpatronage.  In either event, respondent argues that the subject gains and losses cannot be combined with or netted against petitioner's patronage losses.

This and the other courts to have considered whether an item of income should be classified as patronage or nonpatronage, have resolved the issue based upon the relationship of the transaction that generated the income to the marketing, purchasing, or service activities of the cooperative.  CF Indus., Inc. v. Commissioner, 995 F.2d 101, 105 (7th Cir. 1993), modifying and affg. T.C. Memo. 1991-568; Cotter & Co. v. United States, 765 F.2d 1102, 1106 (Fed. Cir. 1985); Land O'Lakes v. United States, 675 F.2d 988, 993 (8th Cir. 1982); St. Louis Bank for Coops. v. United States, 224 Ct. Cl. 289, 624 F.2d 1041, 1050 (1980); Buckeye Countrymark, Inc. v. Commissioner, 103 T.C. 547, 562-563 (1994); Certified Grocers of Cal., Ltd. v. Commissioner, 88 T.C. 238, 243 (1987); Illinois Grain Corp. v. Commissioner, 87 T.C. 435, 459 (1986); Dundee Citrus Growers Association v. Commissioner, T.C. Memo. 1991-487; Washington-Oregon Shippers Coop., Inc. v. Commissioner, T.C. Memo. 1987-32; Twin Country Grocers, Inc. v. United States, 2 Cl. Ct. 657, 662 (1983); Astoria Plywood Corp.

v. United States, 43 AFTR 2d 79-816, 79-1 USTC par. 9197 (D. Or. 1979); Linnton Plywood Association v. United States, 410 F. Supp. 1100, 1108 (D. Or. 1976).

As appears from these cases, if the income at issue is produced by a transaction which is directly related to the cooperative enterprise, such that the transaction facilitates the cooperative's marketing, purchasing or service activities, then the income is deemed to be patronage income.  See, e.g., Cotter & Co. v. United States, supra at 1106; Land O'Lakes, Inc. v. United States, supra at 993; Certified Grocers of Cal., Ltd. v. Commissioner, supra at 243; Illinois Grain Corp. v. Commissioner, supra at 459.  On the other hand, if the income is derived from a transaction that has no integral and necessary linkage to the cooperative enterprise, such that it may fairly be said that the income is merely incidental to the cooperative enterprise and does nothing more than add to the overall profitability of the cooperative, then the income is deemed to be nonpatronage income.  See, e.g., Cotter & Co. v. United States, supra at 1106; Land O'Lakes, Inc. v. United States, supra at 993; Certified Grocers of Cal., Ltd. v. Commissioner, supra at 243; Illinois Grain Corp. v. Commissioner, supra at 459.

The determination of whether income derived by a cooperative from a transaction that is directly related to the cooperative enterprise and, thus, is patronage income is a determination that is necessarily fact intensive. Certified Grocers of Cal., Ltd. v. Commissioner, 88 T.C. 238, 244 (1987); Illinois Grain Corp. v. Commissioner, 87 T.C. 435, 459 (1986); Washington-Oregon Shippers Coop., Inc. v. Commissioner, T.C. Memo. 1987-32. In considering the relatedness of the income-producing transaction to the cooperative enterprise, it is important to focus on the "totality of the circumstances" and to view the business environment to which the income-producing transaction is related and not to view the transaction so narrowly "as to limit it only to its income-generating characteristic when such a characterization is not consistent with the actual activity." Cotter & Co. v. United States, supra at 1106-1107; Dundee Citrus Growers Association v. Commissioner, T.C. Memo. 1991-487.

The "directly related" test applied by the courts is traceable to published rulings issued by the Commissioner, such as Rev. Rul. 69-576, 1969-2 C.B. 166, and Rev. Rul. 74-160, 1974-1 C.B. 245, that interpreted patronage income broadly. See CF Indus., Inc. v. Commissioner, supra at 105; Illinois Grain Corp. v. Commissioner, supra at 453;

cf. <u>Land O'Lakes, Inc. v. United States</u>, <u>supra</u> at 993.

In Rev. Rul. 69-576, <u>supra</u>, the Commissioner held that an amount received by the taxpayer, a nonexempt cooperative, as a patronage dividend from a bank for cooperatives should be considered patronage income in the taxpayer's hands. The taxpayer cooperative became eligible to receive the patronage dividend from the bank for cooperatives by reason of the fact that it had borrowed from the bank to finance the acquisition of agricultural supplies for resale to its members.  The Commissioner reviewed section 1.1382-3(c)(2), Income Tax Regs., and articulated the following test for classifying an item of income as patronage or nonpatronage income:

> Section 1.1382-3(c)(2) of the Income Tax Regulations defines the term "income derived from sources other than patronage" to mean incidental income derived from sources not directly related to the marketing, purchasing, or service activities of the cooperative association.  For example, income derived from the lease of premises, from investment in securities, or from the sale or exchange of capital assets, constitutes income derived from sources other than patronage.

> The classification of an item of income as from either patronage or nonpatronage sources is dependent on the relationship of the activity generating the income to the marketing, purchasing, or service activities of the cooperative. If the income is produced by a transaction which actually facilitates the accomplishment of the cooperative's marketing, purchasing, or service activities, the income is from patronage sources. However, if the transaction producing the income

does not actually facilitate the accomplishment
of these activities but merely enhances the
overall profitability of the cooperative, being
merely incidental to the association's
cooperative operation, the income is from
nonpatronage sources.

Accordingly, inasmuch as the income received
by the nonexempt cooperative from the bank for
cooperatives resulted from a transaction that
financed the acquisition of agricultural supplies
which were sold to its members, thereby directly
facilitating the accomplishment of the
cooperative's purchasing activities, it is held
that the allocation and payment of this same
amount by the nonexempt farmers' cooperative to
its own patrons (farmers) qualifies as a
patronage dividend. * * * [Rev. Rul. 69-576,
supra.]

Similarly, in Rev. Rul. 74-160, 1974-1 C.B. 245, the

Commissioner ruled that interest income realized from loans

made by the taxpayer, a nonexempt cooperative engaged in

the manufacture and sale of plywood, to the taxpayer's

chief supplier was patronage income.  According to the

ruling, the loans were necessary in order to permit the

supplier to finance equipment needed to carry on its

business operations and, without the loans, the supplier

would have been unable to supply the taxpayer.  Thus, the

Commissioner ruled that the interest income paid by the

supplier to the taxpayer was classified as patronage income

because it "actually facilitated the accomplishment of

taxpayer's cooperative activities, in that it enabled the

taxpayer to obtain necessary supplies for its operations."

In effect, the Commissioner ruled that the patronage dividend received by the taxpayer in Rev. Rul. 69-516, supra, and the interest income received by the taxpayer in Rev. Rul. 74-160, supra, qualified for inclusion in the taxpayer's net earnings from "business done with or for its patrons". Sec. 1388(a)(3). In neither case were patrons of the taxpayer cooperative directly involved in the transaction out of which the income arose. Compare Rev. Rul. 73-497, 1973-2 C.B. 18, in which the Commissioner ruled that interest paid to a bank for cooperatives by other farm credit banks did not qualify as patronage income because the payors were "not patrons of the taxpayer". This ruling has been criticized by the courts and it has not been followed. See St. Louis Bank for Coops. v. United States, 224 Ct. Cl. 289, 624 F.2d 1041, 1051 (1980); see also Cotter & Co. v. United States, 765 F.2d 1102, 1106 (Fed. Cir. 1985).

Generally, under the "directly related" test, as applied by the courts, transactions with third parties can qualify as business "with or for" patrons, as long as the transaction is reasonably related to the business which the cooperative conducts with its patrons and benefits the patrons, other than incidentally through the generation of extra income. St. Louis Bank for Coops. v. United States,

624 F.2d at 1051-1052.  As the court said in <u>Twin County</u> <u>Grocers, Inc. v. United States</u>, 2 Cl. Ct. 657, 662 (1983):

> A common thread runs through each of the cases and rulings above summarized.  Although the income at issue is generated by transactions between nonexempt cooperatives and nonpatrons, it is deemed to be patronage sourced because those transactions facilitate the basic functions of the cooperative in some way other than simple money management or overall profitability.

In applying the "directly related" standard, the courts have classified dividend income from a subsidiary of the cooperative as patronage income if the business of the subsidiary, out of which the dividends are paid, is reasonably related to the basic purpose of the cooperative. For example, in <u>Linnton Plywood Association v. Commis-</u> <u>sioner</u>, 410 F. Supp. 1100 (D. Or. 1976), the court held that dividends received by the taxpayer, a workers' cooperative, with respect to the capital stock it held in a glue manufacturing enterprise constituted patronage income.  The taxpayer in that case was engaged in the manufacture and sale of plywood and plywood products. See <u>id.</u>  To secure a reliable supply of glue, a material essential to the manufacture of plywood, the taxpayer and another cooperative organized a glue manufacturing enterprise.  See <u>id.</u>  Each cooperative owned 50 percent of the capital stock of the glue manufacturer.  During

the year, the taxpayer received dividends from the glue
manufacturer which it included in its net earnings as
patronage income.  See id.  In holding that the dividends
were patronage income, the court stated:

> Glue is essential to the manufacture of ply-
> wood, and the arrangement which [the taxpayer-
> cooperative] made to produce its glue through a
> supplier which it and another plywood workers'
> cooperative organized is reasonably related to
> the business done with or for its patrons.
> [Id.]

Cf. Rev. Rul. 74-160, supra (interest paid on loans made
by taxpayer cooperative to its chief supplier held to be
patronage income).

Similarly, in Land O'Lakes, Inc. v. United States,
675 F.2d 988 (8th Cir. 1981), the court considered the
patronage classification of dividends received by the
taxpayer, a nonexempt cooperative, with respect to its
stock in a bank for cooperatives.  The court noted that
the taxpayer was required to acquire and hold the stock to
obtain a loan, the proceeds of which were used to finance
cooperative activities on favorable terms.  See id. at 993.
The court found that the subject transaction in which the
taxpayer received the dividends was not "significantly
distinguishable" from the transactions involved in Rev.
Rul. 69-576, supra, and Rev. Rul. 74-160, supra, and held

that the dividends should be classified as patronage

income.  Id. at 993.  According to the court, "because the

transactions actually facilitated the cooperative's

activities by providing financing on terms favorable to

the cooperative, the income from the bank stock was from a

patronage source and therefore was properly deductible as a

patronage dividend."  Id.

In the same vein, the Commissioner ruled in Rev. Rul.

75-228, 1975-1 C.B. 278, that the dividends received by the

taxpayer, a farmers' cooperative, from its wholly owned

Domestic International Sales Corp. (DISC), should be

classified as patronage income.  The ruling formulates the

"directly related" test to be used in classifying patronage

and nonpatronage income as follows:

> The classification of an item of income as
> from either patronage or nonpatronage sources is
> dependent upon the relationship of the activity
> generating the income to the marketing, purchas-
> ing, or service activities of the cooperative.
> Thus, if the income is produced by a transaction
> directly, connected with marketing patrons'
> products, the income is from patronage sources.
> [Rev. Rul. 75-228, supra, 1975-1 C.B. 179.]

The ruling notes that the dividends paid by the DISC were

from the selling commissions earned by the DISC from

selling the products of the taxpayer's patrons.

Accordingly, the ruling concludes that the dividend income

was produced by a transaction directly connected with marketing patrons' products.

The objective of distinguishing between patronage and nonpatronage income is "bound up with the basic concept of a cooperative", that is, transforming the cooperative's net income into lower prices for its patrons. CF Indus., Inc. v. Commissioner, 995 F.2d 101, 103 (7th Cir. 1993), modifying and affg. T.C. Memo. 1991-568. In making this determination, the courts have recognized that cooperatives should be permitted to take the action that is reasonably necessary under the circumstances without suffering the loss of benefits under subchapter T. As the court stated in Cotter & Co. v. United States, 765 F.2d at 1110: "Subchapter T was also not enacted to require that a cooperative acting for its patrons function in an economically unreasonable manner or penalize it for acting reasonably."

The taxpayer in Cotter & Co. v. United States, supra, was a nonexempt cooperative that purchased, warehoused, and distributed products for its members, small independent hardware retailers. See id. The court agreed with the taxpayer that interest income from short-term commercial paper and certificates of deposit purchased with temporarily unneeded funds was properly treated as

patronage income. According to the court, by keeping short-term commercial paper the taxpayer was acting to retain its liquidity in order to prepay for goods at a discount and, thus, was "acting as any reasonable business person". Id. at 1107. The court compared the taxpayer's actions "to placing its funds in a bank account." See id. The court also agreed with the taxpayer that rental income from leasing temporarily excess warehouse space to tenants should be classified as patronage income. The court noted that the warehouse space was rented only as part of the taxpayer's "plan to expand its space over its then-existing needs" and not as apart of a separate warehouse rental business. Id. at 1109. The court set forth the following guiding principle for application of the directly related test:

> We agree with the Claims Court that Congress did not intend the term "with or for patrons" to be "of unlimited scope, [so that] all income produced by cooperatives that is passed through to patrons would be, in essence, income obtained for patrons, and would, therefore, be considered patronage sourced." Cotter, 6 Cl. Ct. at 227. A cooperative cannot merely "clothe its shareholders as patrons and its corporate dividends as patronage payments" and retain the benefits of Subchapter T. Mississippi Valley, 408 F.2d at 835. But Subchapter T was also not enacted to require that a cooperative acting for its patrons function in an economically unreasonable manner or penalize it for acting reasonably. Considering the income-generating transaction in its relation to all the activity undertaken to

fulfill a cooperative function will allow courts to distinguish from cooperative activity transactions which merely enhance overall profitability in a manner incidental to cooperative function. Such activity is not to receive the benefits of Subchapter T, but other activity, which does directly relate to cooperative function when considered in its actual business environment, cannot properly be considered outside "business done with or for patrons." Cotter's transactions here were not merely to gain incidental profits; they resulted from activities integrally intertwined with the cooperative's functions. The earnings Cotter in this case produced and passed through to its members are patronage dividends. [Id. at 1110.]

Similarly, in Illinois Grain Corp. v. Commissioner, 87 T.C. 435 (1986), the Court agreed that rental income from two barges that the taxpayer caused to be constructed, leased from an insurance company, and subleased to a barge company constituted patronage income. The Court found that "petitioner's leasing and subleasing of barges to its transportation cooperative was not an 'investment' in such barges, intended to produce merely passive rental income, but was an integral part of its overall cooperative activity in moving its patrons' grain to market." Id. at 461.

In derogation of the "directly related" test, described above, respondent argues in this case that capital gains and losses are always classified as non-patronage without consideration of the relatedness of the

transaction to the cooperative enterprise.  Respondent

argues that section 1.1382-3(c)(2), Income Tax Regs.,

establishes this per se nonpatronage rule for capital gains

and losses.  The regulation provides as follows:

> (2) Definition.  As used in this paragraph, the
> term "income derived from sources other than
> patronage" means incidental income derived from
> sources not directly related to the marketing,
> purchasing, or service activities of the
> cooperative association.  For example, income
> derived from the lease of premises, from
> investment in securities, or from the sale or
> exchange of capital assets, constitutes income
> derived from sources other than patronage.
> [Sec. 1.1382-3(c)(2), Income Tax Regs.]

This regulation is expressly applicable only to exempt

farmers' cooperatives.  However, the concept "income

derived from sources other than patronage", is a concept

applicable to both exempt and nonexempt cooperatives, and

the Courts have applied the regulation to nonexempt

cooperatives as well as to exempt cooperatives.  See

Buckeye Countrymark, Inc. v. Commissioner, 103 T.C. at

547, 563 (1994); see also, e.g., CF Indus., Inc. v.

Commissioner, 995 F.2d 101, 102 (7th Cir. 1993), modifying

and affg. T.C. Memo. 1991-568; Cotter & Co. v. United

States, 765 F.2d 1102, 1106 (Fed. Cir. 1985); Certified

Grocers, Ltd. v. Commissioner, 88 T.C. 238, 244 n.13

(1987).  But see Gold Kist, Inc. v. Commissioner, 104 T.C.

696, 717 n.26 (1995) (declining to apply sec. 1.1382-3(b), Income Tax Regs., to a nonexempt cooperative), revd. on other grounds 110 F.3d 769 (11th Cir. 1997).

Section 1.1382-3(c)(2), Income Tax Regs., defines nonpatronage income as "incidental income derived from sources not directly related to the marketing, purchasing, or service activities of the cooperative association."  The regulation then gives three examples of nonpatronage income derived from the lease of premises, from investment in securities, and from the sale or exchange of capital assets.  See sec. 1.1382-3(c)(2), Income Tax Regs. According to respondent, "by giving 'income from the sale or exchange of capital assets' as an example of non-patronage source income, Treas. Reg. section 1.1382-3(c)(2) establishes a per se rule that the capital gains and losses of a nonexempt cooperative are to be classified as non-patronage source items."  We note that in considering this regulation, the court in CF Indus., Inc. v. Commissioner, supra at 106, described it as "hopelessly equivocal".

Neither this nor any other court has ever held that rents, dividends or interest income, or capital gains are nonpatronage based upon a per se rule found in section 1.1382-3(c)(2), Income Tax Regs.  See, e.g., CF Indus., Inc. v. Commissioner, supra (interest from short-term

financial investments); <u>Cotter & Co. v. United States</u>, 765 F.2d 1102 (Fed. Cir. 1985) (income from rental of excess warehouse space); <u>Land O'Lakes v. United States</u>, 675 F.2d 988 (8th Cir. 1982) (dividends); <u>Illinois Grain Corp. v. Commissioner</u>, 87 T.C. 435 (1986) (dividends and income from rental of barges); <u>Dundee Citrus Growers Association v. Commissioner</u>, T.C. Memo. 1991-487 (interest income); <u>Linnton Plywood Association v. United States</u>, 410 F. Supp. 1100 (D. Or. 1976).

In fact, the premise of respondent's argument, that section 1.1382-3(c)(2), Income Tax Regs., requires income from the lease of premises, from investment in securities, and from the sale or exchange of capital assets to be treated as nonpatronage per se was rejected by this Court in <u>Illinois Grain Corp. v. Commissioner</u>, <u>supra</u> 451. In that case, the Court noted that "the apparently clear language of the regulation", stating that income from the lease of premises, from investment in securities, or from the sale or exchange of capital assets are examples of nonpatronage income is language that, under the law, as it has developed, "does not always mean what it literally says." <u>Id.</u> The Court continued as follows:

> Thus, in the case of interest, both the courts and respondent have acknowledged that interest income may have the quality of income

from patronage sources, depending upon the circumstances. <u>Cotter & Co. v. United States</u>, 765 F.2d 1102 (Fed. Cir. 1985); <u>St. Louis Bank for Coops. v. United States</u>, 224 Ct. Cl. 289, 624 F.2d 1041 (1980); Rev. Rul. 74-160, 1974-1 C.B. 245. Dividend income has sometimes likewise been held to be patronage-sourced. <u>Land O'Lakes, Inc. v. United States</u>, 675 F.2d 988 (8th Cir. 1982); <u>Linnton Plywood Association v. United States</u>, 410 F. Supp. 1100 (D. Ore. 1976); Rev. Rul. 75-228, 1975-1 C.B. 278. Rental income has also been held to be patronage-sourced, on occasion. <u>Cotter & Co. v. United States</u>, <u>supra</u>; Rev. Rul. 63-58, 1963-1 C.B. 109 (semble); and some capital gains income has been held to be income from patronage sources, under the circumstances presented in the particular case. <u>Astoria Plywood Corp. v. United States</u>, an unreported case (D. Ore. 1979), 43 AFTR 2d 79-1114, 79-1 USTC par. 9197; contra Rev. Rul. 74-160, 1974-1 C.B. 245. [<u>Id.</u>]

Significantly, in the last case cited above, in response to the Government's argument that "all capital gains are not patronage source income," the court stated: "In my view, capital gains may be patronage source income. In each instance, it depends on whether the income is 'directly related' to Astoria's activities." <u>Astoria Plywood Corp. v. United States</u>, 43 AFTR 2d 79-1114, 79-1119, 79-1 USTC par. 9197, at 86,349 (D. Or. 1979).

Moreover, the Commissioner has twice ruled that in appropriate circumstances capital gains can be classified as patronage income. See Rev. Rul. 74-24, 1974-1 C.B. 244; Rev. Rul. 71-439, 1971-2 C.B. 321. Each of those rulings involves a nonexempt cooperative engaged in the manufacture

and sale of plywood and related wood products.  The taxpayer in each ruling owned standing timber which had appreciated in value and served as a source of raw material for the taxpayer's products.  The issue was whether the capital gains recognized by each cooperative upon cutting the timber, pursuant to an election under section 631(a), could be classified as patronage income.  Section 631(a) provides an election to certain taxpayers to treat, as gain or loss from a sale or exchange under section 1231, the difference between the actual cost or other basis of the timber cut during the year and its fair market value as standing timber.  See sec. 1.631-1(a), Income Tax Regs. In each ruling, the Commissioner took the position that the capital gains recognized by the cooperative are properly classified as patronage income.

The classification of capital gains realized pursuant to the election under section 631(a) as patronage income was tacitly approved by this Court in Stevenson Co-Ply, Inc. v. Commissioner, 76 T.C. 637 (1981).  That case involved a dispute concerning the computation of the alternative tax under section 1201(a) with respect to section 631(a) gains.  We held that, for purposes of computing the alternative tax, a taxpayer is entitled to

reduce its section 631(a) gains by the amounts distributed to its stockholder employees as patronage dividends.

The capital gains in Rev. Rul. 74-24, supra, and Rev. Rul. 71-439, supra, are similar to the capital gain realized from the sale of Terra stock in the instant case. In both rulings, the Commissioner recognizes that "the gain * * * represents the unrealized appreciation in value of timber cut during the year". Rev. Rul. 74-24, supra; Rev. Rul. 71-439, supra. Both rulings make the point that the actual realization of the appreciation in the value of the standing timber would take place when the finished product is sold. Similarly, the gain from the sale of petitioner's Terra stock was attributable in large measure to appreciation in the value of the oil and gas reserves held by Terra. If petitioner had not been forced to sell the stock of Terra, the realization of the appreciation in Terra's oil and gas reserves would have taken place upon Terra's production and sale of oil and gas and would have been directly related to petitioner's business of supplying petroleum products to its patrons.

Respondent's argument that capital gains and losses must always be classified as nonpatronage income implies that there is no transaction out of which capital gains or losses arise that can be directly related to the

cooperative enterprise of a cooperative.  Of course, this argument is contrary to Rev. Rul. 74-24, supra, and Rev. Rul. 71-439, supra, in which the Commissioner ruled that capital gains recognized by a cooperative pursuant to an election under section 631(a) are properly classified as patronage income.  See Rev. Rul. 74-24, supra; Rev. Rul. 71-439, supra.

According to respondent, under the per se rule set forth in section 1.1382-3(c)(2), all capital gains and losses must be classified as nonpatronage.  This includes not only gains and losses realized from the sale or other disposition of capital assets, as defined by section 1221, but also gains and losses from the sale or other disposition of "property used in the trade or business", as defined by section 1231(b).  Section 1231 governs the tax consequences of gains and losses realized from the disposition of depreciable property used in a trade or business.

Generally, the gains and losses from the sale or exchange of section 1231 assets that are recognized during the taxable year are netted together.  See sec. 1231(a).  If the gains exceed the losses for the taxable year, then all of the gains and losses are treated as long-term capital gains and losses.  See sec. 1231(a)(1).  If the

losses exceed the gains for the taxable year, then all of the gains and losses are treated as ordinary gains and losses. See sec. 1231(a)(2). Respondent argues that any gain or loss that is treated as a capital gain or loss under section 1231 should be classified as from nonpatronage sources.

As a threshold matter, respondent's argument does not satisfactorily explain why assets that qualify as property used in the trade or business under section 1231(b) are subject to a per se rule under section 1.1382-3(c)(2), Income Tax Regs., which is formulated in terms of "income derived * * * from sale or exchange of capital assets". Assets treated as "property used in the trade or business", as defined by section 1231(b), are excluded from the definition of the term "capital asset". Sec. 1221(2). See St. Louis Bank for Coops. v. United States, 624 F.2d at 1053, where the Court rejects the Commissioner's classification of gain from the sale of a car as nonpatronage income under section 1.1382-3(c)(2), Income Tax Regs., and points out that the Commissioner's treatment was erroneous "since the car was not a capital asset under section 1221 of the Code."

Respondent's position is that, if the section 1231 gains and section 1231 losses for the taxable year are

treated as "long-term capital gains or long-term capital losses" under section 1231(a)(1) (by reason of the fact that the aggregate section 1231 gains exceed the aggregate section 1231 losses for the taxable year), then each section 1231 gain and loss realized during the year is automatically deemed to be a nonpatronage item under the per se rule. On the other hand, if the section 1231 gains and losses for the taxable year are not "treated as gains and losses from sales or exchanges of capital assets" under section 1231(a)(2) (by reason of the fact that the aggregate section 1231 gains do not exceed the aggregate section 1231 losses for the taxable year), then each section 1231 gain and loss realized during the year is deemed to be a patronage item under the per se rule. Under respondent's position, therefore, the patronage classification of gains and losses from the sale or exchange of property used in the trade or business is determined by the mathematical result of the netting process under section 1231. It has nothing to do with whether the property or the transactions from which the gains or losses arose are related to the operations of the cooperative. This is contrary to section 1.1382-3(c)(2), Income Tax Regs., which formulates the distinction between patronage and nonpatronage in terms of whether the item is

"incidental income derived from sources not directly related to the marketing, purchasing, or service activities of the cooperative association."

In the event that the aggregate section 1231 gains exceed losses for the taxable year, respondent's position is that the gain realized from the sale or exchange of each section 1231 asset is automatically classified as nonpatronage, except for the portion of the gain treated as ordinary income under the recapture rules prescribed by sections 1245. According to respondent, the portion of the gain recaptured under section 1245 is considered patronage income "because, in effect the taxpayer is merely recapturing income that otherwise would have been available for distribution as a patronage dividend." Rev. Rul. 74-84, 1974-1 C.B. 244. According to respondent, the same is true with respect to the portion of the gain recaptured under section 1250.

A logical inconsistency in respondent's per se rule arises in the case of recapture under section 1250. This is due to the fact that, generally, section 1250 requires recapture only of "additional depreciation" or depreciation in excess of straight-line depreciation. Sec. 1250(b). Under respondent's position, the straight-line depreciation taken on depreciable real property held for more than 1

year would not be recaptured as ordinary income under section 1250 and, accordingly, would be treated as nonpatronage income, despite the fact that it is no different than depreciation recaptured under section 1245.

Respondent argues that the gain realized in excess of the portion recaptured as ordinary income under section 1245 or section 1250, is nonpatronage income, assuming that there is a net section 1231 gain for the taxable year. Respondent suggests that this portion of the gain is always attributable to appreciation in the value of the section 1231 assets, "the invisible hand of the market place" and can never be directly related to the activities of the cooperative. Respondent cites Astoria Plywood Corp. v. United States, 43 AFTR 2d 79-816, 79-1 USTC par. 9197 (D. Or. 1979), as authority for that position. That case, however, involved an entity that had operated for 16 years as a for-profit corporation before becoming a cooperative. The machinery that was sold had been used and fully depreciated before the taxpayer became a cooperative and it was sold in the same year the taxpayer became a cooperative. In that case, there was no factual basis on which to conclude that the income from the sale of the machinery was related in any way to the cooperative activities of the taxpayer. Thus, that case does not

support respondent's argument that the realization of appreciation is always unrelated to the activities of a cooperative.

Indeed, contrary to respondent's argument, respondent's own rulings suggest that appreciation in the value of an asset can be taken into account as patronage income. As mentioned above, in Rev. Rul. 74-24, supra, and Rev. Rul. 71-439, supra, the Commissioner ruled that the capital gain recognized pursuant to an election under section 631(a) is patronage income. In those rulings "the gain * * * represents the unrealized appreciation in value of timber cut during the year." Rev. Rul. 74-24, supra at 244; Rev. Rul. 71-439, supra at 322. Furthermore, under respondent's own position, section 1231 gains attributable to appreciation in the value of the asset will be treated as patronage income, if there is a net section 1231 loss for the taxable year.

According to respondent, it is also proper to classify section 1231 losses as from patronage sources. Respondent argues as follows:

> The same rationale applies to section 1231 losses and results in such losses being quite properly classified as patronage-sourced losses unless demonstrated otherwise. Section 1231 losses occur when the amount realized upon disposition of an asset is less than its basis as adjusted to reflect appreciation or other cost recovery

mechanism deductions. The result for such a loss is that the cumulative effect of the business usage of the asset resulted in even greater degradation in its value than anticipated and provided by the depreciation or other cost recovery mechanism which was utilized for the asset. As with section 1245 or 1250 recapture, such a loss is logically patronage-sourced unless proved otherwise. The same conclusion also results under the operating versus nonoperating focus of the provisions of subchapter T since the loss is directly attributable to cooperative activities unless proven otherwise. Thus, the classification of section 1231 losses as patronage-sourced makes economic sense.

The flaw in respondent's argument, however, is that the classification of section 1231 gains and losses is based upon whether there is a net section 1231 gain or loss for the taxable year. Thus, section 1231 losses which respondent asserts are "logically patronage-sourced" will be treated as nonpatronage income under respondent's position if there is a net section 1231 gain for the taxable year.

In light of the foregoing, we decline to abandon the directly related test that has been used by this and other courts to distinguish patronage from nonpatronage items and to adopt respondent's per se nonpatronage rule for capital gains and losses. Accordingly, in this case our task is to determine whether each of the gains and losses at issue was realized in a transaction that was directly related to the cooperative enterprise, or in one which generated

incidental income that contributed to the overall profitability of the cooperative but did not actually facilitate the accomplishment of the cooperative's marketing, purchasing, or service activities on behalf of its patrons. See, e.g., Cotter & Co. v. United States, 765 F.2d at 1106. This determination requires an examination of the factual relationship between the activity producing the gains or losses and the cooperative's patronage activities.

Respondent acknowledges that the directly related test as formulated in Rev. Rul. 69-576, 1969-2 C.B. 166, supra, has been adopted and applied by the courts. However, respondent argues that the directly related test as applied by the courts "is an overly simplistic approach to the question at hand." Respondent asks the Court to apply a new 2-part test. As we understand it, respondent argues that the Court should not only determine whether the transaction from which the subject income arose is directly related to the cooperative enterprise, but it should also determine whether the type of income at issue is the "customary operating income of the cooperative." Respondent formulates the test as follows:

> The proper test focuses on identifying the
> regular, everyday operating activities of the
> cooperative and the anticipated ordinary profits

therefrom and then determining whether the income or loss item in question was an unavoidable result of transaction which was an integrally necessary part of the regular course of those activities.

Under respondent's new test, gain or loss from the sale of an asset could never be classified as patronage income, unless the cooperative is in the trade or business of selling such assets.

We agree with respondent that the normal operating activities of a cooperative and the income realized therefrom should be taken into account in considering whether an item of income is patronage or nonpatronage. However, we do not believe that an item of income is automatically excluded from classification as patronage income if it does not match the customary operating income of the cooperative.

## Gain from the Sale of Terra Stock and Losses from the Liquidation of Seaway and the Surrender of Mex-Am Stock

We disagree with respondent's requested finding that "the Terra, Seaway and Mex-Am, stock were investments." From the facts discussed above, it is evident that the business of each of the three corporations in issue, Terra, Seaway, and Mex-Am, was closely and directly related to petitioner's cooperative business of supplying petroleum products to its patrons, and that the formation and

operation of each of the three corporations facilitated petitioner's cooperative enterprise.  In our view, petitioner's acquisition of the stock of Terra, Seaway, and Mex-Am was no more an investment than the taxpayer's acquisition of the stock from which the taxpayer received dividends in <u>Linnton Plywood Association v. United States</u>, 410 F. Supp. 1100 (D. Or. 1976), a case that respondent relies upon here, no more of an investment than the stock of the bank for cooperatives that was involved in <u>Land O'Lakes v. United States</u>, 675 F.2d 988 (8th Cir. 1982), and no more of an investment than the stock of the DISC that was involved in Rev. Rul. 75-228, 1975-1 C.B. 278.  The issue in those cases was whether dividends paid on the stock should be classified as patronage income.  The issue here is whether income from the sale of such stock should be classified as patronage from patronage sources.

<u>Sale of Terra Stock</u>

Petitioner formed Terra to explore for and produce crude oil and natural gas for petitioner's refineries which used the crude oil to produce petroleum products that were sold to petitioner's patrons.  Petitioner sold its stock in Terra during a time of financial distress to raise cash necessary to reduce its debt load and restore its financial stability.  At the time it sold its stock in Terra,

petitioner was reacting to extreme economic distress. Petitioner was on the verge of bankruptcy caused by an agricultural recession and large debt. To remain in business, petitioner needed to reduce its interest expense. Petitioner's primary creditor, the Wichita Bank, required that it sell assets to reduce its debt load. Petitioner sold its Terra stock because it was the only asset that could be sold quickly to raise substantial cash but it structured the sale to retain a call on the crude oil produced by Terra.

We cannot find that this transaction merely enhanced the overall profitability of the cooperative and was merely incidental to petitioner's cooperative operation. In our view, the sale of Terra was necessary for petitioner's continued operation, and, thus, it was directly related to petitioner's cooperative enterprise and actually facilitated the accomplishment of those activities.

Disposition of Stock of Seaway and Mex-Am

We also find that the losses petitioner realized on the disposition of its capital stock in Seaway and Mex-Am constitute patronage losses. As with Terra, respondent mischaracterizes the business relationship between petitioner and both Seaway and Mex-Am. Petitioner acquired its interests in Seaway and Mex-Am in an effort to

vertically integrate its petroleum production business. The fact that Seaway was a common carrier under Federal law, and that there is no evidence that petitioner ever received crude oil from Mex-Am, does not convert petitioner's interests in those entities to mere passive investments. Each corporation was organized to perform functions that were related to petitioner's petroleum business.

Petitioner's holding of the stock of each corporation was directly related to petitioner's petroleum business. Petitioner disposed of its interests in Seaway and Mex-Am because changes in the crude oil market made those interests unnecessary. As with the sale of Terra stock, the losses realized are from transactions that are directly related to petitioner's petroleum business. As such, we find that the losses realized are from patronage sources.

Gains From the Sale of Section 1231 Assets

During the years in issue, petitioner disposed of three groups of assets which are described in section 1231(b) as "property used in the trade or business". These include the Lamont gas plant, the soybean processing facilities, and the miscellaneous section 1231 assets. Collectively, we refer to these assets as the section 1231 assets.

Lamont Gas Plant

At the outset, we note that petitioner reported the gain realized from its sale of the Lamont gas plant in 1984 as ordinary income. In the subject notice of deficiency, respondent recharacterized the gain as a capital gain, pursuant to section 1231. Petitioner does not take issue with respondent's determination that the gain from the sale of the Lamont gas plant is subject to section 1231.

Petitioner purchased, operated, and expanded the Lamont gas plant as part of its main cooperative effort of producing petroleum-based goods for its patrons. During the time petitioner owned the plant, virtually all of the natural gas liquids produced there were either sold to petitioner's patrons or used in producing gasoline for sale to its patrons.

The sale of the Lamont gas plant took place after feasibility studies suggested that advantages would be gained in expanding petitioner's natural gas liquids plants in Texas. The bulk of the proceeds of the sale of the Lamont gas plant went to expanding the Texas plants in order to enable petitioner to realize those advantages for the benefit of its patrons. Accordingly, we find that the gain from the sale of the Lamont gas plant was realized in

a transaction that is directly related to petitioner's cooperative enterprise and, therefore, is patronage income.

Soybean Processing Facilities

Part of petitioner's patronage activities during the years in issue included purchasing soybeans from its patrons and processing them into soy oil and soy meal. Petitioner sold the soy oil to unrelated food processors for use in products such as margarine and processed the soy meal into livestock feed which it sold to its members. Petitioner sold its soybean processing facilities as part of a plan to consolidate its soybean processing operations with those of Boone Valley and Land O'Lakes.

The circumstances surrounding petitioner's sale of the soybean facilities are similar to those surrounding the sale of the Lamont gas plant. Petitioner sold its soybean facilities as part of a plan to make those operations more profitable for its patrons. The consolidation plan was completed in four steps: (1) Petitioner sold its soybean facilities to Boone Valley for $29.1 million; (2) petitioner purchased Boone Valley's Eagle Grove, Iowa, feed mill for $10 million; (3) Boone Valley changed its name to Ag Processing, Inc.; and (4) the patrons of petitioner, Land O'Lakes, and the former Boone Valley received all of the equity interest in Ag Processing, Inc. The result of

these transactions was a consolidation of petitioner's soy processing capacity with that of Land O'Lakes and Boone Valley.

Petitioner agreed to the consolidation plan based on a study it had commissioned on methods of improving its soybean processing efficiency and maximizing savings to patrons. In a letter to petitioner's members printed in its 1983 annual report, Mr. Kenneth Nielson, petitioner's president at the time, and Mr. Francis Gwin, chairman of petitioner's board of directors, described the consolidation as follows:

> [The consolidation plan] will be a good thing for farmers, eliminating some of the duplication of efforts and creating a stronger cooperative soy processing entity to improve producers' return.

Petitioner's 1983 annual report further describes the reasons for the consolidation as follows:

> Although its own plants are well-located geographically and operationally, to compete with industry, Farmland took a leadership role in the unification study. President Ken Nielson said the unification plan would eliminate duplication of some farmer-owned facilities and services and create a new organization of a size better able to compete to farmers' economic benefit.
>
> At year end Farmland's soy operations joined those of Land O'Lakes and Boone Valley in the newly unified Boone Valley cooperative Processing

Association (a new name is to be later selected), headquartered in Omaha, Neb.

The purpose of the consolidation plan was to serve patrons better. Petitioner entered into the transaction because it believed it could process its members' soybeans less expensively after the consolidation. As such, we find that petitioner's sale of the soybean facilities was directly related to its patronage activities of producing soybean products for its patrons.

Miscellaneous Section 1231 Assets

In 1983, petitioner disposed of approximately 525 miscellaneous depreciable assets used in its business. These included tractors and other vehicles, livestock, buildings, office furniture, and office equipment. The assets in question were miscellaneous depreciable assets used in the operation of petitioner's business. Petitioner disposed of the assets in the ordinary course of business when they became obsolete or were no longer useful.

Petitioner's sales of the miscellaneous section 1231 assets in this case is similar to the taxpayer's sale of an automobile in St. Louis Bank for Coops. v. United States, 224 Ct. Cl. 289, 624 F.2d 1041, 1050 (1980). In that case, the taxpayer sold the automobile after it was fully depreciated and purchased a new one. In holding that the

gain on the sale of the automobile was patronage income,
the court stated:

> The gain on the sale of the automobile was
> patronage-sourced because * * * it was "directly
> related" to the plaintiff's normal activities.
> The automobile was one of three used in the
> plaintiff's business, and the cost of operating
> it, including depreciation, was treated as an
> expense of serving plaintiff's patrons.  The
> sale of the car when it was no longer needed
> for plaintiff's business, was closely related
> to and stemmed from the prior use of the car.
> Depreciable assets used in a business were out
> and become obsolete, and when that happens,
> frequently they are sold or traded in for a
> replacement. * * *  [St. Louis Bank for
> Cooperatives v. United States, 624 F.2d at
> 1053-1054.]

We believe that the sale of the miscellaneous assets in
this case was closely related to and stemmed from their use
in petitioner's cooperative enterprise of providing
petroleum products to its patrons.  Accordingly, we find
that petitioner's sales of the subject assets were directly
related to its patronage activities of supplying products
to and marketing products for its members.  We therefore
find that the subject gain can be classified as from
patronage sources.

A final note is necessary.  As mentioned above,
petitioner argues, if we adopt respondent's per se rule,
then the stock of Terra, Seaway, and Am-Mex were noncapital
assets in its hands "under case law 'surrogacy', 'source of

supply', and 'hedging' principles" and not subject to the hedging regulations, section 1.1221-2, Income Tax Regs. Petitioner's brief makes it clear that the Court need not consider that argument if we do not adopt respondent's per se rule. Accordingly, we have not addressed that argument. Similarly, as mentioned above, petitioner argues, if we hold that the gains from the sale of Terra stock and the section 1231 assets are nonpatronage items, then those gains may nevertheless be offset by petitioner's patronage losses. We have not addressed that argument.

In light of the foregoing, and to reflect previously determined issues,

<u>Decision will be entered under Rule 155 and an order will be issued denying respondent's motion for summary judgment</u>.